**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| CHEVRON CORPORATION,<br>    1400 Smith Street, Houston, Texas 77002<br>    U.S.A.,<br><br>and<br><br>TEXACO PETROLEUM COMPANY,<br>    1400 Smith Street, Houston, Texas 77002<br>    U.S.A.,<br><br>                              *Petitioners*,<br><br>         v.<br><br>THE REPUBLIC OF ECUADOR,<br>    c/o Procurador General del Estado<br>    Av. Amazonas N39-123 y Arízaga, Quito,<br>    Ecuador,<br><br>                              *Respondent*. | Civil Action No. 26-2513 |

**PETITION TO RECOGNIZE ARBITRATION AWARD**

Petitioners Chevron Corporation ("Chevron") and Texaco Petroleum Company ("TexPet," and together with Chevron, "Petitioners") hereby petition this Court for an order confirming, recognizing and enforcing the compensatory obligations of a final and binding arbitration award issued in The Hague, the Netherlands, on November 17, 2025, by an international tribunal (the "Tribunal") administered by the Permanent Court of Arbitration ("PCA") in favor of the Petitioners and against the Respondent, the Republic of Ecuador ("Ecuador" or "Respondent"), in PCA Case No. 2009-23 (the "Arbitration").[1]  The award, as corrected by a decision of the Tribunal

---

[1]This Petition is supported by the Memorandum of Law in Support of Petition to Recognize Arbitration Award and by the Declaration of Wade Coriell in Support of Petition to Recognize Arbitration Award, dated July 17, 2026 (the "Declaration" or "Decl.") and all exhibits thereto. "Exhibit" or "Ex." refers to the Exhibits to the Declaration.

dated February 5, 2026 (the "Track III Award," Exs. 1-2), was issued following arbitration proceedings conducted in accordance with the treaty between the United States of America and the Republic of Ecuador Concerning the Encouragement and Reciprocal Protection of Investment (the "Bilateral Investment Treaty" or "BIT") and under the 1976 Arbitration Rules of the United Nations Commission on International Trade Law ("UNCITRAL Rules").

The Track III Award arises out of a 17-year-long arbitration conducted by the duly constituted Tribunal, in which both Petitioners and Respondent actively participated. The Tribunal previously issued six awards on jurisdiction and on the merits, all of which were upheld by the courts of the arbitral seat in the Netherlands. The Track III Award, which determined that Ecuador should compensate Petitioners in an amount exceeding $215 million plus post-award interest, is well reasoned, issued by a properly constituted Tribunal, and based on voluminous legal submissions, witness testimony, and expert reports. In fact, the Track III Award is over 1,000 pages long. There is no valid reason why the Track III Award should not be recognized by this Court. A duly certified, true and correct copy of the public Track III Award is attached as Exhibit 1 to the accompanying Declaration.[2]

Petitioners respectfully request that the Court recognize and enforce the compensatory obligations of the Track III Award under the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 38 (the "New York Convention"), and its implementing statute 9 U.S.C. § 201 *et seq.*, and enter judgment

---

[2] Upon agreement of all parties to the Arbitration, the public version of the Track III Award contains minimal redactions of certain identifying and other information relating to individuals who are not parties to this proceeding or the Arbitration. Those minimal redactions appear in paragraphs 792, 823, 825, 826, 827, 851, 2393, and 2530.

for Petitioners in the amount of the present value of the Track III Award as of the date of judgment, including accrued post-award interest.

In support of this Petition, Petitioners respectfully state as follows:

## NATURE OF THE ACTION

1. Petitioners bring this proceeding to recognize and enforce the Track III Award under 9 U.S.C. §§ 201-08 and Article III of the New York Convention. The Track III Award was issued by the Tribunal, which was administered by the PCA, constituted pursuant to the Bilateral Investment Treaty, and seated in The Hague, the Netherlands, in a proceeding captioned *Chevron Corporation and Texaco Petroleum Company v. Republic of Ecuador* (PCA Case No. 2009-23). Decl. ¶ 4; Ex.1.

2. Petitioners respectfully request that this Court confirm, recognize, and enforce the Track III Award and incorporate its terms into a judgment in favor of Petitioners. Petitioners also seek to recover the fees and expenses incurred in recognizing the Track III Award, along with further relief as this Court may find just and proper.

3. Under the New York Convention and its implementing statute, actions to recognize an arbitral award are summary in nature. The showing required to avoid recognition is high, and the burden of establishing the factual predicate necessary to deny recognition rests with the party resisting recognition.

## PARTIES

4. Petitioner Chevron is a company incorporated under the laws of the State of Delaware, with its principal place of business at 1400 Smith Street, Houston, Texas 77002, U.S.A. Chevron is an integrated energy company specializing in the exploration, production, refinement, and distribution of oil and gas products.

5.    Petitioner TexPet is a company incorporated under the laws of the State of Delaware, with its principal place of business at 1400 Smith Street, Houston, Texas 77002, U.S.A. TexPet is a wholly owned, indirect subsidiary of Chevron.

6.    Respondent Ecuador is a sovereign nation.  Among other entities, Ecuador owns and controls Empresa Estatal de Petróleos de Ecuador ("PetroEcuador"), a corporation formed under the laws of Ecuador with the objectives of exploration, development, production and marketing of Ecuador's crude oil.   Ex. 5 ¶ 1.5.  Ecuador is a "foreign state" within the meaning of the Foreign Sovereign Immunities Act of 1976 (the "FSIA").  28 U.S.C. § 1603(a).

## JURISDICTION AND VENUE

7.    This Court has subject-matter jurisdiction in this proceeding under 28 U.S.C. § 1330(a), which provides that "[t]he district courts shall have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state . . . to any claim for relief in personam with respect to which the foreign state is not entitled to immunity."  Ecuador is a foreign state and is not entitled to immunity under the exceptions to immunity set forth in the FSIA at 28 U.S.C. § 1605.

8.    Specifically, Section 1605(a)(6) creates an exception to sovereign immunity in any case brought to recognize an arbitration award made pursuant to "an agreement made by the foreign state with or for the benefit of a private party to submit to arbitration all or any differences which have arisen or which may arise between the parties with respect to a defined legal relationship, whether contractual or not," and where the award is or may be "governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement" of such award.  The Track III Award was made pursuant to the BIT, which provides that investment disputes between an investor (here, Chevron and TexPet) and the host country

4

(here, Ecuador) may be resolved through arbitration. Ex. 3 art. VI(4). Further, the Track III Award is governed by the New York Convention, which calls for the international recognition and enforcement of arbitration awards, and to which both Ecuador and the United States are Contracting States. *See, e.g.*, Ex. 1 ¶ 2676.

9. In addition, Ecuador waived its immunity from jurisdiction pursuant to 28 U.S.C. § 1605(a)(1) by becoming a Contracting State to the New York Convention and agreeing to arbitrate this dispute in another Contracting State. Article VI of the BIT provides for arbitration of claims in accordance with the UNCITRAL Rules and to occur in a state that is a party to the New York Convention. Ex. 5 ¶ 2.7; Ex. 3 art. VI. Accordingly, the Arbitration occurred in the Netherlands, a Contracting State to the New York Convention.[3] Under this Court's precedent, Ecuador thereby waived its immunity from recognition actions in the United States courts.

10. Additionally, this action falls under the New York Convention and therefore arises under the laws and treaties of the United States. 9 U.S.C. § 203. This proceeding "fall[s] under the Convention" because the Track III Award was made in an arbitration between Petitioners and Respondent, which is not a citizen of the United States, and which arose out of the parties' commercial, legal relationship and underlying contractual agreements. *See* 9 U.S.C. § 202 (providing that an "arbitral award arising out of a legal relationship . . . which is considered as commercial . . . falls under the Convention" unless the relationship was "entirely between citizens of the United States"). Because this action arises under the laws and treaties of the United States, this Court also has subject-matter jurisdiction under 28 U.S.C. § 1331.

---

[3] New York Convention, Contracting States, available at https://www.newyorkconvention.org/contracting-states/contracting-states (last visited July 16, 2026) (listing the Netherlands as a Contracting State as of June 10, 1958, ratified on April 24, 1964).

11.     Upon service of process, this Court will have personal jurisdiction over Ecuador under 28 U.S.C. § 1330(b), which confers "[p]ersonal jurisdiction over a foreign state . . . as to every claim for relief" for which the foreign state does not enjoy sovereign immunity under 28 U.S.C. §§ 1605–1607, and where service has been made pursuant to 28 U.S.C. § 1608.

12.     Venue is proper in this District under 28 U.S.C. § 1391(f)(4), which provides that venue lies in this District for any action "brought against a foreign state or political subdivision thereof."

## FACTUAL BACKGROUND

13.     The Track III Award arises from a dispute concerning Ecuador's role in the issuance and attempted enforcement of a fraudulent, multi-billion-dollar Ecuadorian court judgment (the "Lago Agrio Judgment").  The Lago Agrio Judgment purported to hold Chevron liable for the environmental impact of oil exploration and production by a consortium that included TexPet, which later became an indirect subsidiary of Chevron, even though Ecuador had contractually released TexPet from liability.  The Lago Agrio Judgment was later determined by the Tribunal to be (i) barred by a prior release and (ii) a denial of justice under international law because it was the product of manufactured evidence, bribery, and other acts of fraud.  A United States federal court and numerous courts outside Ecuador have likewise refused to enforce it. Thus, the Track III Award is based on Ecuador's blatant disregard of the contractual release it gave TexPet and of its obligations under international treaties, investment agreements, and customary international law.

### TexPet's Operations in Ecuador

14.     As set forth in one of the Tribunal's earlier awards on the merits, the dispute underlying the Track III Award concerns TexPet's historical participation as a member of a

consortium with Ecuador and Ecuador's state-owned oil company, PetroEcuador, that explored for and produced oil in Ecuador under various concession contracts (the "Oil Consortium"). Ex. 7 ¶¶ 4.55-4.65.

16. After its participation in the Oil Consortium ended in 1992, TexPet executed a settlement agreement with Ecuador and PetroEcuador whereby TexPet assumed responsibility for specified environmental remediation projects corresponding to its minority ownership interest, and Ecuador and PetroEcuador released TexPet from liability for any environmental impact falling outside the scope of the specified projects (the "1995 Settlement Agreement"). Ex. 7 ¶¶ 4.157-4.162.

16. In compliance with the 1995 Settlement Agreement, TexPet fully remediated its share of any environmental impacts arising from its operations in Ecuador. Ex. 7 ¶ 4.68. All relevant agencies of the Ecuadorian government inspected and certified the remediation work and confirmed that it was completed in accordance with the 1995 Settlement Agreement. Ex. 7 ¶¶ 3.25-3.26; Ex. 5 ¶¶ 3.23, 3.26.

17. In 1998, Ecuador and PetroEcuador executed an agreement releasing TexPet, as well as its affiliates and principals, from any liability for environmental impact in the area where the Oil Consortium explored and produced oil (the "1998 Release Agreement," and together with the 1995 Settlement Agreement, the "Settlement Agreements"). Ex. 7 ¶¶ 3.27-3.29, 4.69. As described in the Tribunal's earlier award on jurisdiction and admissibility, Ecuador and PetroEcuador retained responsibility for any remaining impact caused by the Oil Consortium's activities prior to 1992, as well as for any impact caused by PetroEcuador's subsequent operations in the area covering the former concession contracts. Ex. 5 ¶ 3.26; *see also* Ex. 7 ¶¶ 7.70, 10.2-

7

10.3.  TexPet had also previously entered into similar settlement and release agreements with the four main municipalities that comprised that same area.  Ex. 7 ¶¶ 3.25-3.26; Ex. 5 ¶ 3.23.

18.     TexPet became a subsidiary of Chevron in 2001.  Ex. 7 ¶ 4.186.  Chevron itself has never conducted any oil exploration or production work in Ecuador.

**The Underlying Dispute**

19.     In May 2003, a group of Ecuadorian plaintiffs (the "Lago Agrio Plaintiffs") brought the Lago Agrio Litigation against Petitioners in Lago Agrio, Ecuador, seeking damages and other remedies for alleged impacts caused by the Oil Consortium's operations.  Ex. 5 ¶ 3.34.

20.     Despite having released TexPet from these very claims, Ecuador publicly promoted the Lago Agrio Plaintiffs' claims.  Ex. 5 ¶ 3.39.  In doing so, Ecuador sought to shift to Petitioners (i) its own contractual share of liability for any remaining environmental impacts caused by the Oil Consortium for activities that occurred prior to 1992, (ii) responsibility for any environmental impact caused by PetroEcuador's own oil operations in the area since 1992, and (iii) liability for any environmental impact caused by government-sanctioned agricultural and industrial exploitation in the Amazonian region.

21.     Ecuador's judicial branch conducted the Lago Agrio Litigation in disregard of Ecuadorian law, international standards of justice and fairness, and Petitioners' basic due process and natural justice rights, all in coordination with the Ecuadorian executive branch and the Lago Agrio Plaintiffs.  *See* Ex. 7 ¶¶ 5.175, 5.178, 5.189, 5.214, 5.234, 8.28, 8.33-8.34, 8.46, 8.50-8.52, 8.56, 8.60, 8.77-8.78.

22.     On February 14, 2011, the Ecuadorian Provincial Court of Sucumbíos (the "Lago Agrio Court") issued the Lago Agrio Judgment, which found Petitioners liable for various categories of harm.  The Lago Agrio Judgment resulted in a base damages award of $8.646 billion

and a punitive damages award of an additional $8.646 billion, the latter part of which would be eliminated if Petitioners issued a public apology within 15 days of the issuance of the Judgment. An additional 10% of the Lago Agrio Judgment was awarded to the Amazon Defense Front (the "ADF"), amounting to $864 million, to be paid into a newly established trust with the ADF as its beneficiary.  Ex. 7 ¶¶ 4.442, 5.2.

23.    The Lago Agrio Judgment was later clarified by the Lago Agrio Court (Judge Zambrano) through a Clarification Order issued on March 4, 2011, which confirmed that $18.2 billion in damages had to be paid by Petitioners, including $8.6 billion as punitive damages subject to a timely public apology by Petitioners and a separate 10% award to the ADF.  Ex. 7 ¶¶ 5.2, 5.123-5.125.

24.    On November 12, 2013, the Ecuadorian National Court affirmed the Lago Agrio Judgment in part and reversed it in part, holding that the Lago Agrio Judgment improperly imposed punitive damages because Ecuadorian law does not permit awards for punitive damages or a requirement of a public apology.  As such, the Ecuadorian National Court upheld the Lago Agrio Judgment but reduced the total damages amount to $8.646 billion, plus $864 million to be paid to the ADF.  Ex. 7 ¶¶ 4.477, 5.172.

25.    As the Tribunal found, however, the Lago Agrio Judgment was not drafted by the Lago Agrio Court.  Instead, the Lago Agrio Judgment was "corruptly ghostwritten" by certain of the Lago Agrio Plaintiffs' legal representatives with the Lago Agrio Court's "corrupt connivance." Ex. 7 ¶¶ 5.17, 5.226, 5.231.  The Tribunal further found that, in their appeal of the Lago Agrio Judgment, the Petitioners presented evidence stating "a strong prima facie case of judicial misconduct, procedural fraud," and "the ghostwriting of the Lago Agrio Judgment."  Ex. 7 ¶ 8.28.

9

But the Ecuadorian appellate courts "did not review," and failed to address, that evidence.  *Id.*  ¶¶ 5.175, 5.178, 5.189, 5.214, 5.234, 8.34.

26.   Although the Ecuadorian courts refused to consider Petitioners' evidence of malfeasance and allowed the fraudulent Lago Agrio Judgment to remain enforceable worldwide, a United States court subsequently determined that the Lago Agrio Judgment was the product of fraud, racketeering, and corruption, and numerous courts have refused to enforce it.  On March 4, 2014, Judge Lewis A. Kaplan of the United States District Court for the Southern District of New York held that the Lago Agrio Judgment should not be enforced because it had been procured by fraud, and that the lead attorney behind the judgment, Steven Donziger, had, in obtaining the judgment, violated the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), and committed acts of extortion, money laundering, wire fraud, Foreign Corrupt Practices Act violations, witness tampering, and obstruction of justice.  *Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362 (S.D.N.Y. 2014).  The United States Court of Appeals for the Second Circuit affirmed that judgment on August 8, 2016, and ruled that the lawyers behind the Lago Agrio Judgment, including Donziger, had committed a "parade of corrupt actions . . . including coercion, fraud, and bribery."  *Chevron Corp. v. Donziger*, 833 F.3d 74, 126 (2d Cir. 2016).  Courts in Argentina, Brazil, Canada, and other jurisdictions have refused to enforce the Lago Agrio Judgment.

**Petitioners Commence Arbitration Against Ecuador**

27.   Ecuador's conduct in the Lago Agrio Litigation, and its role in facilitating the issuance of the Lago Agrio Judgment, constituted a breach of the Settlement Agreements.  These breaches violated the terms of the BIT and the investment agreement between Ecuador and TexPet.  In addition, the Lago Agrio Judgment had been procured through fraud, bribery, and corruption, and Ecuador's conduct violated Petitioners' due process rights and denied them justice.

10

28.     The BIT provides for the option of binding arbitration in the event of an investment dispute between a "national or company" of one country and the other country to the treaty. Specifically, Article VI of the BIT provides in relevant part:

> (2): In the event of an investment dispute, the parties to the dispute should initially seek a resolution through consultation and negotiation. **If the dispute cannot be settled amicably, the national or company concerned may choose to submit the dispute, under one of the following alternatives, for resolution**:
>
> > a) to the courts or administrative tribunals of the Party that is a party to the dispute; or
> >
> > b) in accordance with any applicable, previously agreed dispute-settlement procedures; or
> >
> > c) **in accordance with the terms of paragraph 3**.
>
> (3): (a) Provided that the national or company concerned has not submitted the dispute for resolution under paragraph 2 (a) or (b) and that six months have elapsed from the date on which the dispute arose, **the national or company concerned may choose to consent in writing to the submission of the dispute for settlement by binding arbitration . . . in accordance with the Arbitration Rules of the United Nations Commission on International Trade Law (UNCITRAL).**

Ex. 3 art. VI (emphasis added).

29.     A copy of the BIT is attached as Exhibit 3 to the Declaration.

30.     Pursuant to the terms of the BIT, Petitioners, which are "companies" organized under the laws of the United States and investors in Ecuador, submitted the dispute with Ecuador to arbitration under the UNCITRAL Rules.  Ex. 5 ¶¶ 1.11-1.13.

31.     Petitioners commenced the Arbitration by serving Ecuador with a Notice of Arbitration on September 23, 2009.  *Id.*; Ex. 4.  Among other relief, Petitioners sought money damages for all harm incurred by Petitioners as a result of the Lago Agrio Litigation and enforcement of the Lago Agrio Judgment.  Ex. 6 ¶ 48.

32.     The Arbitration proceedings commenced on September 29, 2009.  Ex. 5 ¶ 1.13.

33.     By agreement of the parties, the Arbitration has been conducted under the auspices of the PCA, and the seat of the Arbitration is The Hague, the Netherlands.  Ex. 5 ¶ 1.14.

34.     The Tribunal of esteemed arbitrators was duly constituted on February 25, 2010. The presiding arbitrator was Van Vechten Veeder QC, an English barrister and scholar of arbitration.  Following his passing in March 2020, Mr. Veeder was replaced by Albert Jan van den Berg, a highly experienced arbitrator, Honorary President of the International Council for Commercial Arbitration, Emeritus Professor of Law (arbitration chair) at Erasmus University Rotterdam in the Netherlands, and a Visiting Professor at Georgetown University Law Center and University of Miami School of Law, among other law schools.  The Tribunal also included Dr. Horacio A. Grigera Naón (nominated as co-arbitrator by Petitioners), a former Secretary General of the International Court of Arbitration of the International Chamber of Commerce and presently the Director of the Center of International Commercial Arbitration at the American University Washington College of Law, and Vaughan Lowe KC (nominated as co-arbitrator by Respondent), an English barrister and Emeritus Chichele Professor of Public International Law at the University of Oxford.  Ex. 5 ¶ 1.16; Ex. 1 ¶ 9.

35.     The parties were represented by counsel throughout the course of the Arbitration. Petitioners were represented by counsel from King & Spalding LLP and Three Crowns LLP (among others).  Respondent was represented by counsel from the Ecuador Attorney General's Office, Winston & Strawn LLP, Dechert LLP, and Foley Hoag, LLP (among others).  Ex. 1 ¶¶ 4, 6; Ex. 7 ¶¶ 1.4, 1.6.

36.     By procedural order, the Tribunal divided the merits of the dispute into two parts, which the Tribunal titled "Track I" and "Track II."  Track I addressed preliminary legal issues

12

arising exclusively from the Settlement Agreements.  Track II focused on all other extant issues required for a final decision resolving the merits of the dispute.  Ex. 6 ¶ 4.

37.    Before arriving at the Track I and Track II merits portion of the Arbitration, the Tribunal first considered a number of preliminary issues.  On February 27, 2012, the Tribunal issued the Third Interim Award on Jurisdiction and Admissibility (the "Jurisdictional Award").

38.    In the Jurisdictional Award, the Tribunal determined that it had jurisdiction to hear the parties' dispute under the arbitration provisions of the BIT.  Specifically, the Tribunal found that the dispute was an "investment dispute" as defined by the BIT, and that Petitioners were covered investors under the BIT: TexPet as a direct investor and party to the Settlement Agreements, and Chevron as an indirect investor through its indirect ownership of TexPet.  Ex. 5 ¶¶ 5.1-5.5; *see also* Ex. 7 ¶¶ 7.70-7.71, 7.78, 7.115.

39.    A true and correct copy of the Jurisdictional Award is attached to the Declaration as Exhibit 5.

### *Track I*

40.    In Track I, the Tribunal addressed preliminary legal issues necessary for the final resolution of the parties' dispute.  This included the gate-keeping issue of whether Chevron, which was not originally a party to the Settlement Agreements, was a "Releasee" as defined by those agreements and therefore able to invoke contractual rights thereunder.  Ex. 6 ¶ 4.

41.    With respect to Track I, the Tribunal considered several rounds of written submissions from both parties.  These submissions consisted of multiple written briefs from each side, 19 expert reports, 3 joint expert reports, and 4 witness statements.  The issues under Track I were argued by the parties at a hearing in London, United Kingdom, held on November 26-28, 2012.  Ex. 6 ¶¶ 6-12.

42.     On September 17, 2013, the Tribunal issued a partial award (the "Track I Award") addressing the Track I issues.

43.     In the Track I Award, the Tribunal held that both Petitioners were "Releasees," as defined in both of the Settlement Agreements, with access to all the contractual rights granted to the same.  Specifically, the Tribunal found that the scope of the releases in Article 5 of the 1995 Settlement Agreement and Article IV of the 1998 Release Agreement had the legal effect under Ecuadorian law of precluding any "diffuse" claim against Petitioners by any individual not claiming personal harm (actual or threatened).  Ex. 6 ¶¶ 111-112.  The Lago Agrio Judgment (as affirmed by the Ecuadorian appellate courts) decided only such "diffuse" claims.  Ex. 7 ¶ 10.8.

44.     A true and correct copy of the Track I Award is attached to the Declaration as Exhibit 6.  Ecuador subsequently challenged the Track I Award and the Jurisdictional Award, among other decisions of the Tribunal, in the District Court of The Hague in the Netherlands.  The District Court of The Hague dismissed Ecuador's challenge in January 2016.  Ex. 7 ¶ 4.146; *see generally* Ex. 8.

45.     In April 2016, Ecuador appealed the dismissal of its challenge, and, in July 2017, The Hague Court of Appeal affirmed the District Court's decision.  Ex. 7 ¶ 4.146; *see generally* Ex. 9.  Ecuador further appealed to the Supreme Court of the Netherlands, which dismissed the appeal in April 2019.  Ex. 1 ¶ 2018; *see generally* Ex. 10.

### *Track II*

46.     After the Tribunal issued the Track I Award, the Tribunal took up the parties' arguments on Track II.  With respect to Track II, the Tribunal considered several rounds of written submissions from both parties, which included a number of written pleadings, expert reports, joint expert reports, and witness statements.  Ex. 7 ¶¶ 1.47-1.55.  The Track II issues were argued by

14

the parties at a hearing in Washington, D.C., held between April 21 and May 8, 2015. Ex. 7 ¶ 1.56.

47.    On August 30, 2018, the Tribunal issued another partial award addressing the Track II issues (the "Track II Award"). Ex. 7.

48.    In the Track II Award, the Tribunal found Ecuador liable for breaching the BIT as a result of its issuance of the Lago Agrio Judgment. Ex. 7 ¶¶ 10.1-10.24. In the Track II Award, the Tribunal found, *inter alia,* that:

     i.    Material portions of the Lago Agrio Judgment were "corruptly 'ghostwritten'" for the appointed judge by the Lago Agrio Plaintiffs' representatives in exchange for a bribe. Ex. 7 ¶ 10.4.

     ii.    Ecuador had violated its obligations towards Petitioners as "Releasees" under the 1995 Settlement Agreement. *Id.* ¶¶ 10.7-10.9.

     iii.    The Lago Agrio Judgment "grossly violated the fundamental procedural rights" of Petitioners, was contrary to international public policy, and should not be recognized nor enforced by any State with knowledge of Ecuador's said denial of justice. *Id.* ¶ 10.10.

     iv.    Ecuador is liable for any injury to Petitioners caused by the recognition or enforcement of any part of the Lago Agrio Judgment either within or outside of Ecuador. *Id.* ¶ 10.11.

     v.    Ecuador is directed to cease all current and future recognition and enforcement efforts of the Lago Agrio Judgment. *Id.* ¶ 10.13.

49.    In addition, the Tribunal found that Ecuador's conduct with respect to the Lago Agrio Judgment amounted to a "denial of justice" under the standards of customary international law. *See generally id.* Part VIII. Specifically, in the Track II Award, the Tribunal found that Ecuador denied justice to Petitioners when:

     i.    It failed to take appropriate steps to address Petitioners' allegations of judicial misconduct, including the "ghostwriting" of the Lago Agrio Judgment. *Id.* ¶¶ 8.34, 8.46, 8.59, 8.76-8.77, 10.5-10.6.

     ii.    Ecuador and its appellate courts left the Lago Agrio Judgment "unremedied" even in the face of "sufficient information" amounting to "a strong prima facie case of

15

judicial misconduct" and "procedural fraud" in the Lago Agrio Litigation. *Id.* ¶¶ 8.28, 8.51.

50.    The Track II Award also contained a series of injunctive orders obligating Respondent to take "corrective measures intended to wipe out all the consequences of Respondent's internationally wrongful acts." Ex. 1 ¶ 2736; Ex. 7 ¶ 10.13.

51.    A true and correct copy of the Track II Award is attached to the Declaration as Exhibit 7.

52.    On December 10, 2018, Ecuador sought to set aside the Track II Award in the District Court of The Hague.  The District Court denied this application on September 16, 2020. *See generally* Ex. 11.  Ecuador appealed to The Hague Court of Appeal, which on June 28, 2022, affirmed the District Court's decision. *See generally* Ex. 12.  On November 17, 2023, the Supreme Court of the Netherlands dismissed Ecuador's appeal.  Ex. 1 ¶ 2019; *see generally* Ex. 13.

### *Track III*

53.    After the Tribunal issued the Track II Award, the Tribunal determined that it would establish a third track of the Arbitration, Track III, to consider the parties' arguments and submissions on the issue of damages.  Ex. 7 ¶¶ 9.121, 10.14, 10.17 & 10.19-10.21.

54.    With respect to Track III, the Tribunal considered four rounds of written submissions from both parties and held two sessions of hearings—on March 16-17, 2021 (by video conference) and from August 18, 2022 to September 7, 2022 (in Washington, D.C.).  Ex. 1 ¶¶ 43, 59-64, 65.

55.    On November 17, 2025, the Tribunal rendered the Track III Award.

56.    In the Track III Award, the Tribunal ordered Ecuador to pay Petitioners the sum of $180,402,691.43, together with pre-award interest through the date of the Track III Award.  The

Tribunal further ordered post-award interest at the rate of 1-year United States Treasury bill plus 2%. *Id.* ¶ 2681.[4]

57.    On December 17, 2025, Respondent submitted to the Tribunal a request for "correction" or "interpretation" of the Track III Award, asserting that the amount awarded to Petitioners should be reduced by about $5 million. Petitioners submitted their response on January 16, 2026. On February 5, 2026, the Tribunal issued its Decision on the Respondent's Request for Correction and Interpretation of the Fourth Partial Award on Track III Under Articles 35 and 36 of the UNCITRAL Arbitration Rules (the "Correction Decision"). Ex. 2. The Correction Decision resolved certain "errors in computation" of the Tribunal's damages calculation. Ex. 2 ¶¶ 24-25. As a result, the sum of awarded damages was reduced from $180,402,691.43 to $175,720,152.45 plus pre-award and post-award interest. *Id.* ¶ 44. Pre-award interest through the date of the Track III Award (November 17, 2025) is $40,470,307.82. Decl. ¶ 8.

58.    As the Tribunal observed in the Correction Decision: "For the avoidance of doubt, the Track III Award, as corrected by this Decision, is now final and binding on the Parties under Articles 32(2) and 36 of the UNCITRAL Arbitration Rules." Ex. 2 ¶ 46.

59.    A true and correct certified copy of the Correction Decision is attached to the Declaration as Exhibit 2.

60.    As of July 17, 2026, post-award interest amounts to $8,189,590.79 and it continues to accrue at the rate of 1-year United States Treasury bill plus 2% per annum (over $33,700 per day).

---

[4] The Track III Award also provides "that any sums collected by the First Claimant in connection with the *Amazonia* Damages Judgments, as well as any costs the First Claimant may in the future collect in the RICO Litigation, must be deducted from the amount of compensation due to the First Claimant under paragraph 2938(vii) above." Ex. 1 ¶ 2939.

61.     The aggregate value of the Track III Award to Petitioners, as of July 17, 2026, is $224,380,051.06 (inclusive of post-award interest accrued to date).  Decl. ¶ 35.[5]

62.     As of the date of this Petition, the entire amount of the Track III Award remains unpaid.  Decl. ¶ 35.

63.     On March 13, 2026, Ecuador served a writ of summons on the Public Prosecutor's office in The Hague for service on Petitioners through the Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters of 15 November 1965 (the "Hague Service Convention 1965"), requesting the District Court of The Hague to set aside the Track III Award.  On April 13, 2026, Ecuador served a rectification writ, clarifying one of the formal procedural notices in the opening sections of the March 13, 2026 writ of summons.  All other contents of the March 13, 2026 writ of summons, including the arguments advanced by Ecuador for setting aside of the Track III Award, remained unchanged.  Decl. ¶ 27.

## BASIS FOR RECOGNITION OF THE TRACK III AWARD

64.     The Track III Award is the result of a valid and duly constituted arbitration between the Petitioners and Ecuador pursuant to the BIT.  It is a thorough, well-reasoned award, issued by a properly constituted tribunal, in a proceeding in which both parties actively participated.  There is no reason why the Track III Award should not be recognized.[6]

65.     The New York Convention applies to "the recognition and enforcement of arbitral awards made in the territory of a State other than the State where the recognition and enforcement of such awards are sought."  New York Convention art. I(1).  As a Contracting State, the United

---

[5] Petitioners will, at the appropriate time, provide the Court with an updated total for accrued post-award interest to be included in a judgment recognizing the Track III Award.

[6] United States courts have used the terms "recognition" and "confirmation" interchangeably when discussing enforcement of arbitral awards under the New York Convention.

States made a reservation that it would "apply the Convention, on the basis of reciprocity, to the recognition and enforcement of only those awards made in the territory of another Contracting State." New York Convention, 21 U.S.T. at 2560. The United States also adopted a commercial reservation, namely that it would "apply the Convention only to differences arising out of legal relationships, whether contractual or not, which are considered as commercial under the national law of the United States." *Id*.

66. Here, all requirements for application of the New York Convention under United States law are satisfied. The Track III Award was made in the Netherlands, a Contracting State to the New York Convention. And it arises out of the BIT, which creates a legal relationship between Petitioners and Ecuador that is commercial in nature.

67. Under the New York Convention and its implementing statute, an arbitral award must be recognized unless one of a limited number of grounds for refusal applies. Section 207 of Title 9 provides that "[w]ithin three years after an arbitral award falling under the Convention is made, any party to the arbitration may apply to any court having jurisdiction under this chapter for an order confirming the award as against any other party to the arbitration. The court *shall confirm* the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention." 9 U.S.C. § 207 (emphasis added).

68. Under the New York Convention, a court can refuse recognition only on a narrow set of specified grounds:

- there is no valid arbitration agreement between the parties;

- the award debtor had no notice of the arbitration proceedings or was unable to meaningfully participate;

- the award resolves a dispute outside the scope of the parties' arbitration agreement;

- the tribunal was composed and/or the arbitration used procedures inconsistent with the parties' arbitration agreement;

19

- the award is not yet binding or has been set aside by a competent authority of the country in which, or under the law of which, the award was made;

- the award resolves a dispute that, under the laws of the country where recognition is sought, cannot be resolved through arbitration; or

- recognizing the award would contravene the public policy of the country where recognition is sought.

*See* New York Convention art. V.

69.    Recognition proceedings are summary in nature, and the party opposing recognition has the burden of showing that one of the grounds set forth in Article V of the New York Convention applies.

70.    As explained further in the accompanying Memorandum of Law, Ecuador cannot establish any basis to refuse recognition of the Track III Award. The BIT's arbitration agreement is valid, and the Tribunal already concluded that Ecuador agreed to arbitrate the dispute that is resolved by the Track III Award. *See* Ex. 5 ¶¶ 4.35, 4.64-71; Ex. 7 ¶¶ 7.70-7.71, 7.78, 7.115, 10.2-10.3.

71.    Ecuador had notice of the arbitration and actively participated in each of its stages. The Tribunal was composed according to the UNCITRAL Rules and followed those rules as required by the BIT.

72.    The Track III Award is final and is binding on the parties. The Track III Award has not been set aside in the Netherlands or any other jurisdiction. As further explained in the accompanying Memorandum of Law, Ecuador's recently-filed set-aside application in the Netherlands does not provide a basis to refuse or defer recognition of the Track III Award.[7]

---

[7] Under the law of the Netherlands, a set-aside application does not automatically suspend the enforcement of the arbitral award.

73.    Recognizing the Track III Award would not offend the public policy of the United States.  Rather, recognition and enforcement of the Track III Award is congruous with United States public policy and its strong preferences in favor of resolving disputes through orderly and expeditious arbitration.

74.    Respondent has not paid Petitioners any portion of the Track III Award.  Decl. ¶ 35.

75.    Accordingly, the New York Convention requires recognition of the Track III Award.

## COUNT I
## (RECOGNITION OF THE TRACK III AWARD UNDER 9 U.S.C. § 207)

76.    Petitioners incorporate each and every allegation in the preceding paragraphs as if set forth fully herein.

77.    The Track III Award is governed by the New York Convention (made applicable in this proceeding by its implementing statute, 9 U.S.C. § 201 *et seq.*) because it arises out of a valid arbitration agreement (reflected in the BIT) and resolves a commercial dispute between Petitioners and Ecuador.  In addition, the seat of the arbitration is the Netherlands, a party to the New York Convention other than the State where recognition and enforcement is hereby sought.

78.    Article IV of the New York Convention provides that a party applying for recognition and enforcement of an award, such as Petitioners here, "shall, at the time of the application, supply: (a) [t]he duly authenticated original award or a duly certified copy thereof; [and] (b) [t]he original agreement [to arbitrate] or a duly certified copy thereof."

79.    A public copy of the Track III Award and the Correction Decision (which forms part of the Track III Award), duly authenticated and transmitted to Petitioners, are submitted herewith as Exhibits 1 and 2 to the Declaration.

80.    A copy of the BIT (which includes the agreement to arbitrate) and Petitioners' Notice of Arbitration are submitted herewith as Exhibits 3 and 4 to the Declaration.

81.    The Track III Award arose out of a legal relationship that is commercial within the meaning of 9 U.S.C. § 202.

82.    Pursuant to Article 32 of the UNCITRAL Rules, arbitration rulings "shall be final and binding on the Parties." UNCITRAL Rules art. 32. Moreover, the arbitration provision of the BIT provides that "any arbitral award rendered pursuant to this Article shall be final and binding on the parties to the dispute." Ex. 3 art. VI(6); *see* Ex. 2 ¶ 46 (the "Track III Award, as corrected by this Decision, is now final and binding on the Parties").

83.    The Track III Award therefore is final and binding within the meaning of the New York Convention.

84.    In an action to recognize an award governed by the New York Convention, Section 207 of Title 9 provides that the "court *shall confirm* the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention." 9 U.S.C. § 207 (emphasis added).

85.    None of the New York Convention's enumerated grounds for refusing recognition applies to the Track III Award.

86.    Accordingly, under 9 U.S.C. § 207, the Track III Award should be recognized and enforced.

87.    Petitioners respectfully request that the Court recognize the Track III Award by entering judgment in favor of Petitioners and against Ecuador in the amount of the Track III Award, with interest as provided therein, plus post-judgment interest as well as the costs of this proceeding.

## PRAYER

WHEREFORE, Petitioners respectfully request:

a.  an order pursuant to 9 U.S.C. § 207 and Article III of the New York Convention recognizing and enforcing the compensatory obligation of the Track III Award and entering judgment thereon;

b.  a money judgment in favor of Petitioners and against Ecuador, in the net amount awarded to Petitioners in the Track III Award, $216,190,460.27, plus additional post-award interest as provided by the Track III Award as well as post-judgment interest at the federal rate pursuant to 28 U.S.C. § 1961;

c.  an award of Petitioners' costs of this civil proceeding, including reasonable attorneys' fees incurred in bringing this proceeding;

d.  an order of this Court retaining jurisdiction over the matter for any further proceedings as may be necessary to enforce the Track III Award and the judgment based thereon; and

e.  any other relief that this Court, in the interests of justice, deems necessary and proper.

A proposed order is appended hereto.

Dated: July 17, 2026
      Washington, D.C.

Respectfully submitted,

By: */s/ Josef M. Klazen*

Josef M. Klazen
D.C. Bar No. 1003749
josef.klazen@kobrekim.com
Steven G. Kobre
D.C. Bar No. 448923
steven.kobre@kobrekim.com
Jeremy O. Bressman (*pro hac vice pending*)
jeremy.bressman@kobrekim.com
Lydia L. Halpern (*pro hac vice pending*)
lydia.halpern@kobrekim.com
Alyssa L. Aubuchon (*pro hac vice pending*)
alyssa.aubuchon@kobrekim.com
KOBRE & KIM LLP
1919 M Street NW
Washington, D.C. 20036
Telephone: (202) 664-1900

*Attorneys for Petitioners Chevron
Corporation and Texaco Petroleum Company*