**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

CHEVRON CORPORATION and
TEXACO PETROLEUM COMPANY,

        *Petitioners*,

    v.

THE REPUBLIC OF ECUADOR,

        *Respondent*.

Civil Action No. 26-2513

## MEMORANDUM OF LAW IN SUPPORT OF PETITION TO RECOGNIZE ARBITRATION AWARD

Josef M. Klazen
Steven G. Kobre
Jeremy O. Bressman (*pro hac vice pending*)
Lydia L. Halpern (*pro hac vice pending*)
Alyssa L. Aubuchon (*pro hac vice pending*)
KOBRE & KIM LLP
1919 M Street NW
Washington, D.C. 20036
Telephone: (202) 664-1900

*Attorneys for Petitioners Chevron Corporation and Texaco Petroleum Company*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ....................................................................................................1

BACKGROUND .........................................................................................................................3

    I.     TexPet's Operations in Ecuador. ........................................................................3

    II.    The Underlying Dispute.......................................................................................5

    III.   Petitioners Commence Arbitration Against Ecuador.........................................7

    IV.   The Tribunal Issues the Track III Award Against Ecuador. ….....................11

    V.    Ecuador Has Failed to Pay the Track III Award. ...........................................14

ARGUMENT...............................................................................................................................14

    I.     Ecuador Is Not Immune from Suit......................................................................14

    II.    The New York Convention and United States Law Require Recognition
          of the Track III Award. ......................................................................................17

          A.    Recognition of the Track III Award is Governed by the New
               York Convention.................................................................................18

          B.    No Basis Exists to Refuse Recognition of the Track III Award. .........20

               1.    The BIT's Arbitration Agreement is Valid, and the
                      Track III Award Resolves a Dispute the Parties Agreed to
                      Arbitrate....................................................................................22

               2.    Ecuador Had Notice of and Fully Participated in the
                      Arbitration. ...............................................................................24

               3.    The Track III Award Is Binding and Has Not Been Set
                      Aside at the Seat of Arbitration. ................................................25

                4.    Recognizing the Track III Award Comports with United
                      States Public Policy. ..................................................................25

          C.    No Basis Exists to Defer Recognition of the Track III Award. ...........26

    III.   Petitioners are Entitled to Reasonable Costs and Attorneys' Fees
          Incurred in Recognizing the Track III Award..................................................29

CONCLUSION ..........................................................................................................................29

**TABLE OF AUTHORITIES**

Page(s)

**Cases**

*Arrington v. Fed. Pub. Def. for D.C.*,
   75 F. Supp. 3d 340 (D.D.C. 2014) ..................................................................................22

*Belize Bank Ltd. v. Gov't of Belize*,
   852 F.3d 1107 (D.C. Cir. 2017) .....................................................................................26

*Belize Soc. Dev. Ltd. v. Gov't of Belize*,
   668 F.3d 724 (D.C. Cir. 2012) .......................................................................17, 21, 25

*BG Grp., PLC v. Republic of Argentina*,
   572 U.S. 25 (2014).............................................................................................. 15-16, 19

*CC/Devas (Mauritius) Ltd. v. Antrix Corp.*,
   605 U.S. 223 (2025) ..............................................................................................14, 15

*Chevron Corp. v. Donziger*,
   833 F.3d 74 (2d Cir. 2016)..............................................................................................7

*Chevron Corp. v. Donziger*,
   974 F. Supp. 2d 362 (S.D.N.Y. 2014).............................................................................7

*Chevron Corp. v. Ecuador*,
   795 F.3d 200 (D.C. Cir. 2015) ............................................... 15, 16, 17, 19, 22-23

*Chevron Corp. v. Republic of Ecuador*,
   949 F. Supp. 2d 57 (D.D.C. 2013) ................................................................15, 22, 25, 27

*Concesionaria Dominicana de Autopistas y Carreteras, S.A. v. Dominican State*,
   926 F. Supp. 2d 1 (D.D.C. 2013) ...................................................................................29

*Creighton Ltd. v. Gov't of Qatar*,
   181 F.3d 118 (D.C. Cir. 1999) .......................................................................................16

*Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*,
   244 F. Supp. 3d 100 (D.D.C. 2017) ...............................................................................21

*Europcar Italia, S.p.A. v. Maiellano Tours, Inc.*,
   156 F.3d 310 (2d Cir. 1998)...........................................................................................27

*Gold Rsrv. Inc. v. Bolivarian Republic of Venezuela*,
   146 F. Supp. 3d 112 (D.D.C. 2015) ...............................................................................27

*Hardy Expl. & Prod. (India), Inc. v. Gov't of India, Ministry of Petrol. & Nat. Gas*,
   314 F. Supp. 3d 95 (D.D.C. 2018) .................................................................................27

*Hulley Enters. v. Russian Fed'n*,
149 F.4th 682 (D.C. Cir. 2025) .......................................................................22, 23

*In re Arb. of Certain Controversies between Getma Int'l and Republic of Guinea*,
142 F. Supp. 3d 110 (D.D.C. 2015) ........................................................................28

*Ipitrade Int'l, S.A. v. Federal Republic of Nigeria*,
465 F. Supp. 824 (D.D.C. 1978) ...................................................................... 16-17

*Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*,
364 F.3d 274 (5th Cir. 2004)..................................................................................21

*\*LLC SPC Stileks v. Republic of Moldova*,
985 F.3d 871 (D.C. Cir. 2021) ........................................................................15, 27

*M.B.L. Int'l Contractors, Inc. v. Republic of Trinidad and Tobago*,
725 F. Supp. 52 (D.D.C. 1989) ...............................................................................16

*Ministry of Def. & Support for the Armed Forces of the Islamic Republic of Iran v. Cubic Def. Sys., Inc.*,
665 F.3d 1091 (9th Cir. 2011)........................................................................ 25-26

*Ministry of Def. of the Islamic Republic of Iran v. Gould Inc.*,
887 F.2d 1357 (9th Cir. 1989)................................................................................21

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
473 U.S. 614 (1985) ................................................................................................25

*OJSC Ukrnafta v. Carpatsky Petrol. Corp.*,
957 F.3d 487 (5th Cir. 2020)..................................................................................22

*Ottley v. Schwartzberg*,
819 F.2d 373 (2d Cir. 1987)....................................................................................20

*\*PAO Tatneft v. Ukraine*,
771 F. App'x 9 (D.C. Cir. 2019) .............................................................................16

*PAO Tatneft v. Ukraine*,
2021 WL 2209460 (D.D.C. June 1, 2021) .............................................................29

*PAO Tatneft v. Ukraine*,
301 F. Supp. 3d 175 (D.D.C. 2018) ........................................................................18

*Robinson v. U.S. Dep't of Educ.*,
502 F. Supp. 3d 127 (D.D.C. 2020) ........................................................................16

*Rusoro Mining Ltd. v. Bolivarian Republic of Venezuela*,
300 F. Supp. 3d 137 (D.D.C. 2018) ........................................................................23

*Schneider v. Kingdom of Thailand*,
688 F.3d 68 (2d Cir. 2012).....................................................................................23

*Sterling Merch. Fin. Ltd. v. Republic of Cabo Verde*,
  261 F. Supp. 3d 48 (D.D.C. 2017) ...............................................................18, 21

*Swiss Inst. of Bioinformatics v. Glob. Initiative on Sharing All Influenza Data*,
  49 F. Supp. 3d 92 (D.D.C. 2014) .........................................................................29

*\*Zhongshan Fucheng Indus. Inv. Co. v. Fed. Republic of Nigeria*,
  112 F.4th 1054 (D.C. Cir. 2024) .......................................................16, 18, 19, 20

**Statutes**

9 U.S.C. § 201 et seq.........................................................................................*passim*

28 U.S.C. § 1330.......................................................................................................14

28 U.S.C. § 1605...........................................................................................14, 15, 16

28 U.S.C. § 1782.......................................................................................................12

Petitioners Chevron Corporation ("Chevron") and Texaco Petroleum Company ("TexPet," and together with Chevron, "Petitioners") respectfully submit this memorandum of law in support of their petition for an order and judgment confirming, recognizing, and enforcing the compensatory obligations of an arbitration award issued in favor of Petitioners and against Respondent, the Republic of Ecuador ("Ecuador" or "Respondent").[1]

## PRELIMINARY STATEMENT

This is an action to recognize and enforce a final, binding arbitration award (the "Track III Award") issued following a protracted arbitration proceeding lasting 17 years. A duly constituted international tribunal (the "Tribunal"), having considered numerous submissions from the parties and having issued various partial awards on liability, issued the Track III Award in The Hague, the Netherlands, on November 17, 2025, in a proceeding administered by the Permanent Court of Arbitration ("PCA") captioned *Chevron Corporation and Texaco Petroleum Company v. Republic of Ecuador* (PCA Case No. 2009-23) (the "Arbitration").

The Track III Award arises out of Ecuador's role in the issuance and attempted enforcement of a fraudulent, multi-billion-dollar Ecuadorian judgment against Chevron (the "Lago Agrio Judgment"). The Lago Agrio Judgment purported to hold Chevron liable for the environmental impact of oil exploration and production that included TexPet (later an indirect subsidiary of Chevron), even though Ecuador had contractually released TexPet of any such liability and even though Chevron itself never participated in any oil exploration or production in Ecuador. The Tribunal determined that the Lago Agrio Judgment was barred by a prior release, and was the product of manufactured evidence, bribery, and other acts of fraud, and that by issuing and refusing to set aside the judgment, Ecuador had committed against Chevron a denial of justice under international law. Meanwhile, a United States federal court issued an

---

[1] Unless otherwise defined, capitalized terms herein have the respective meanings ascribed in the Petition to Recognize Arbitration Award, filed contemporaneously herewith.

injunction preventing the enforcement of the Lago Agrio Judgment in the United States, and numerous other courts outside Ecuador have refused to enforce it.  Thus, the Track III Award and the underlying Arbitration are based on Ecuador's blatant disregard of the contractual release it gave TexPet and of its obligations under international law.

Petitioners commenced the Arbitration in accordance with the Treaty between the United States of America and the Republic of Ecuador Concerning the Encouragement and Reciprocal Protection of Investment (the "Bilateral Investment Treaty" or "BIT").  The BIT provides for arbitration of disputes between United States and Ecuadorian nationals or companies that arise out of any investment in Ecuador.  The Tribunal previously issued several partial awards on the merits—including most notably the "Track I Award," dated September 17, 2013, and the "Track II Award," dated August 30, 2018 (together, the "Partial Awards")—which found Ecuador to be in breach of its settlement obligations and international law. Ecuador's attempts to set aside the Partial Awards in the courts of the Netherlands (the seat of arbitration) all failed.  On November 17, 2025, the Tribunal issued the Track III Award which, as corrected, ordered Ecuador to pay Petitioners $175,720,152.45 in damages; pre-award interest, which totaled $40,470,307.82 as of the date of the Track III Award; and post-award interest accruing at a rate equal to the one-year United States Treasury bill rate plus 2% per annum.  As of the date of the Track III Award, Ecuador owed Petitioners a total of $216,190,460.27. [2]

---

[2] This is the amount based on a subsequent adjustment by the Tribunal.  As described in more detail below, on February 5, 2026, the Tribunal adjusted the amount of the Track III Award downward by approximately $5 million through a "correction" of the pre-interest damages from a total of $180,402,691.43 to a total of $175,720,152.45.  As corrected, pre-award interest was $39,353,091.98 under the last version of Respondent's Damages Model filed with the Tribunal (dated October 15, 2025), and $40,470,307.82 as of November 17, 2025 (the date of the Track III Award). *See infra* p. 13.  The Tribunal's correction decision forms part of the Track III Award.

Ecuador has failed entirely to pay the Track III Award.  Accordingly, Petitioners have initiated proceedings to collect what they are owed.

This Court is now faced with Petitioners' limited request to recognize and enforce the Track III Award.  Ecuador is not entitled to sovereign immunity from this action because two distinct exceptions to immunity under the Foreign Sovereign Immunities Act ("FSIA") apply here.  In addition, federal law, which incorporates the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 38 (the "New York Convention"), requires this Court to recognize international arbitral awards unless one of a few limited and enumerated grounds applies.  But, as discussed below, no basis to deny or defer recognition exists here: (i) the Tribunal has already found the parties' dispute arbitrable under the BIT, and this Court is bound by that determination; (ii) Ecuador had notice of, and fully participated in, the Arbitration; (iii) the Track III Award is binding and has not been set aside; and (iv) recognizing the Track III Award is consistent with United States public policy favoring arbitration.

Accordingly, Petitioners respectfully request that the Court recognize the compensatory obligations of the Track III Award and enter a judgment against Respondent for the full amount of the Track III Award plus post-award interest that has accrued through the date of the Court's order, as well as reasonable attorneys' fees and costs associated with the recognition and enforcement of the Track III Award.

## BACKGROUND

### I.    TexPet's Operations in Ecuador.

As set forth in one of the Tribunal's earlier awards on the merits, the Track III Award arises from a dispute concerning TexPet's historical participation as a minority member of a consortium with Ecuador and Ecuador's state-owned oil company, presently known as Empresa Estatal de Petróleos del Ecuador ("PetroEcuador"), that explored for and produced oil

3

in Ecuador under various concession contracts (the "Oil Consortium").    Ex. 7 ¶¶ 4.55-4.65.[3]

After its participation in the Oil Consortium ended in 1992, TexPet executed a settlement agreement with Ecuador and PetroEcuador (the "1995 Settlement Agreement").    In that agreement, TexPet assumed responsibility for specified environmental remediation projects corresponding to its minority ownership interest in the Oil Consortium, and Ecuador and PetroEcuador released TexPet from liability for any environmental impact falling outside the scope of those projects.  Ex. 7 ¶¶ 4.157-4.162.

In compliance with the 1995 Settlement Agreement, TexPet fully remediated its share of any environmental impacts arising from its operations in Ecuador.  Ex. 7 ¶ 4.68.  All relevant agencies of the Ecuadorian government inspected and certified the remediation work and confirmed that it was completed in accordance with the 1995 Settlement Agreement.  *Id.* ¶¶ 3.25-3.26; Ex. 5 ¶¶ 3.23, 3.26.

In 1998, Ecuador and PetroEcuador executed another agreement releasing TexPet and its affiliates and principals from any liability for environmental impact in the area where the Oil Consortium operated (the "1998 Release Agreement," and together with the 1995 Settlement Agreement, the "Settlement Agreements").  Ex. 7 ¶¶ 3.27-3.29, 4.69.  Under that agreement, and as described by the Tribunal in its Third Interim Award on Jurisdiction and Admissibility (the "Jurisdictional Award"), Ecuador and PetroEcuador retained responsibility for any remaining impact caused by the Oil Consortium's activities prior to 1992, as well as for any impact caused by PetroEcuador's subsequent operations in the area covered by the former concession contracts.  Ex. 5 ¶ 3.26; *see also* Ex. 7 ¶¶ 7.70, 10.2-10.3.  TexPet had also previously entered into similar settlement and release agreements with the four main municipalities that comprised the same geographic area.  Ex. 5 ¶ 3.23; Ex. 7 ¶¶ 3.25-3.26.

---

[3] "Declaration" or "Decl." refers to the Declaration of Wade Coriell in Support of Petition to Recognize Arbitration Award, dated July 17, 2026.  "Exhibit" or "Ex." refers to the Exhibits to that Declaration.

TexPet became an indirect subsidiary of Chevron in 2001.  Ex. 7 ¶ 4.186.  Chevron has never itself conducted any oil production work in Ecuador.

## II.    The Underlying Dispute.

In May 2003, a group of plaintiffs based in Ecuador (the "Lago Agrio Plaintiffs") brought claims against Chevron (as the indirect owner of TexPet) in a court in Lago Agrio, Ecuador, seeking damages and other remedies for alleged impacts caused by the Oil Consortium's operations (the "Lago Agrio Litigation").  Ex. 5 ¶ 3.34.

Despite having released TexPet from these very claims, Ecuador publicly promoted the Lago Agrio Plaintiffs' lawsuit.  Ex. 5 ¶ 3.39.  In doing so, Ecuador sought to shift to Petitioners (i) its own contractual share of liability for any remaining environmental impacts caused by the Oil Consortium for activities that occurred before 1992, (ii) responsibility for any environmental impact caused by PetroEcuador's own oil operations in the area after 1992, and (iii) liability for any environmental impact caused by government-sanctioned agricultural and industrial exploitation in the Amazonian region.  Ecuador's judicial branch conducted the Lago Agrio Litigation in disregard of Ecuadorian law, international standards of justice and fairness, and Petitioners' basic due process and natural justice rights, all in coordination with Ecuador's executive branch and the Lago Agrio Plaintiffs.  *See* Ex. 7 ¶¶ 5.175, 5.178, 5.189, 5.214, 5.234, 8.28, 8.33-8.34, 8.46, 8.50-8.52, 8.56, 8.60, 8.77-8.78.

On February 14, 2011, the Ecuadorian Provincial Court of Sucumbíos (the "Lago Agrio Court") issued the Lago Agrio Judgment finding Petitioners liable for at least seven categories of harm.  The Lago Agrio Court awarded the Lago Agrio Plaintiffs $8.646 billion in base damages and an additional $8.646 billion in punitive damages, the latter of which would be waived if Petitioners issued a public apology within 15 days of the judgment—a cynical attempt by the attorneys who were illicitly involved in ghostwriting the judgment to coerce an admission of liability from Chevron.  An additional 10% of the base damages ($864 million)

was awarded to the Amazon Defense Front (the "ADF"), to be paid into a newly established trust with the ADF as its beneficiary.  Ex. 7 ¶¶ 4.442, 5.2.  On March 4, 2011, the Lago Agrio Court clarified the Lago Agrio Judgment to confirm that Petitioners owed the Lago Agrio Plaintiffs $18.2 billion in damages, which included $8.646 billion as punitive damages, and a separate 10% award to the ADF.  Ex. 7 ¶¶ 5.2, 5.123-5.125.

On November 12, 2013, the Ecuadorian National Court affirmed the Lago Agrio Judgment in part and reversed it in part, holding that the Lago Agrio Judgment improperly imposed punitive damages on Petitioners because Ecuadorian law does not permit awards for punitive damages or a requirement of a public apology.  As such, the Ecuadorian National Court upheld the Lago Agrio Judgment but reduced the total damages amount to $8.646 billion, plus $864 million to be paid to the ADF.  Ex. 7 ¶¶ 4.477, 5.172.

As the Tribunal later found, however, the Lago Agrio Judgment was not drafted by the Lago Agrio Court.  Instead, the Lago Agrio Judgment was "corruptly ghostwritten" by certain of the Lago Agrio Plaintiffs' legal representatives with the Lago Agrio Court's "corrupt connivance."  Ex. 7 ¶¶ 5.17, 5.226, 5.231.  The Tribunal further found that, in their appeal of the Lago Agrio Judgment, Petitioners had presented evidence to the Ecuadorian appellate courts stating "a strong prima facie case of judicial misconduct, procedural fraud," and "the ghostwriting of the Lago Agrio Judgment."  Ex. 7 ¶ 8.28.  But the Ecuadorian appellate courts "did not review," and failed to address, those allegations.  *Id.*  ¶¶ 5.175, 5.178, 5.189, 5.214, 5.234, 8.34.

Although the Ecuadorian courts refused to consider Petitioners' evidence of malfeasance and allowed the fraudulent Lago Agrio Judgment to become enforceable worldwide, a United States court subsequently determined that the Lago Agrio Judgment was the product of fraud, racketeering, and corruption, and numerous other courts have refused to enforce it.  On March 4, 2014, Judge Lewis A. Kaplan of the United States District Court for

the Southern District of New York held that the Lago Agrio Judgment should not be enforced because it had been procured by fraud.  The court determined that the lead attorney behind the judgment, Steven Donziger, had violated the federal Racketeer Influenced and Corrupt Organizations Act ("RICO") and committed acts of extortion, money laundering, wire fraud, Foreign Corrupt Practices Act violations, witness tampering, and obstruction of justice in obtaining the Lago Agrio Judgment.  *See Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362 (S.D.N.Y. 2014).  On August 8, 2016, the United States Court of Appeals for the Second Circuit affirmed, holding that the lawyers behind the Lago Agrio Judgment, including Donziger, had committed a "parade of corrupt actions . . . including coercion, fraud, and bribery."  *Chevron Corp. v. Donziger*, 833 F.3d 74, 126 (2d Cir. 2016).  Courts in Argentina, Brazil, Canada, and other jurisdictions have refused to enforce the Lago Agrio Judgment on these same grounds.

### III.    Petitioners Commence Arbitration Against Ecuador.

As the Tribunal concluded, Ecuador's conduct in the Lago Agrio Litigation and its role in issuing the Lago Agrio Judgment violated both Settlement Agreements.  These breaches also violated the BIT and the investment agreement between Ecuador and TexPet.  In addition, the Tribunal concluded that the Lago Agrio Judgment had been procured through fraud, bribery, and corruption, and that Ecuador's conduct violated Petitioners' due process rights and denied them justice.

The BIT provides for the option of binding arbitration of "investment dispute[s]" between a "national or company" of one party-country and the other party-country. Specifically, Article VI of the BIT provides in relevant part:

> (2): In the event of an investment dispute, the parties to the dispute should initially seek a resolution through consultation and negotiation.  **If the dispute cannot be settled amicably, the national or company concerned may choose to submit the dispute, under one of the following alternatives, for resolution**:
>
> > a)  to the courts or administrative tribunals of the Party that is a party to the dispute; or

7

b) in accordance with any applicable, previously agreed dispute-settlement procedures; or

c) **in accordance with the terms of paragraph 3**.

(3)(a): Provided that the national or company concerned has not submitted the dispute for resolution under paragraph 2 (a) or (b) and that six months have elapsed from the date on which the dispute arose, **the national or company concerned may choose to consent in writing to the submission of the dispute for settlement by binding arbitration . . . in accordance with the Arbitration Rules of the United Nations Commission on International Trade Law (UNCITRAL).**

Ex. 3 art. VI (emphasis added).

Pursuant to the BIT, Petitioners, as "companies" organized under the laws of the United States and investors in Ecuador, submitted the dispute with Ecuador to arbitration under the 1976 Arbitration Rules of the United Nations Commission on International Trade Law (the "UNCITRAL Rules"). Ex. 5 ¶¶ 1.11-1.13. Among other relief, Petitioners sought money damages, resulting from costs incurred by Petitioners as a result of the Lago Agrio Litigation and enforcement of the Lago Agrio Judgment. Ex. 6 ¶ 48.

The Arbitration proceedings commenced on September 29, 2009. By agreement of the parties, the Arbitration was conducted under the auspices of the PCA, with the seat of arbitration at The Hague, the Netherlands. Ex. 5 ¶¶ 1.13-1.14.

The Tribunal of esteemed arbitrators was duly constituted on February 25, 2010. The presiding arbitrator was Van Vechten Veeder QC, an English barrister and scholar of arbitration. Following his passing in March 2020, Mr. Veeder was replaced by Albert Jan van den Berg, a highly experienced arbitrator, Honorary President of the International Council for Commercial Arbitration, Emeritus Professor of Law (arbitration chair) at Erasmus University Rotterdam in the Netherlands, and a Visiting Professor at Georgetown University Law Center and University of Miami School of Law, among other law schools. The Tribunal also included Dr. Horacio A. Grigera Naón (nominated as co-arbitrator by Petitioners), a former Secretary General of the International Court of Arbitration of the International Chamber of Commerce

8

and presently the Director of the Center of International Commercial Arbitration at the American University Washington College of Law, as well as Vaughan Lowe KC (nominated as co-arbitrator by Respondent), an English barrister and Emeritus Chichele Professor of Public International Law at the University of Oxford.  Ex. 5 ¶ 1.16; Ex. 1 ¶ 9.

The parties were represented by counsel throughout the Arbitration.  Petitioners were represented by King & Spalding LLP and Three Crowns LLP (among others).  Respondent was represented by the Ecuador Attorney General's Office, Winston & Strawn LLP,  Dechert LLP, and Foley Hoag LLP (among others).  Ex. 1 ¶¶ 4, 6; Ex. 7 ¶¶ 1.4, 1.6.

Before addressing the merits of the dispute, the Tribunal considered a number of preliminary procedural issues.  On February 27, 2012, the Tribunal issued the Jurisdictional Award, in which it determined that it had jurisdiction to hear the dispute under the arbitration provisions of the BIT.  Specifically, the Tribunal found that the dispute was an "investment dispute" as defined by the BIT, and that Petitioners were covered investors under the BIT: TexPet as a direct investor and party to the Settlement Agreements, and Chevron as an indirect investor through its indirect ownership of TexPet.  Ex. 5 ¶¶ 5.1-5.5; *see also* Ex. 7 ¶¶ 7.70-7.71, 7.78, 7.115.

By procedural order, the Tribunal then divided the merits stage of the dispute into two parts, which the Tribunal titled "Track I" and "Track II."  Track I addressed preliminary legal issues concerning the Settlement Agreements.  These included the gate-keeping issue of whether Chevron, which was not originally a party to the Settlement Agreements, was a "Releasee" as defined by those Agreements and therefore able to invoke contractual rights thereunder.  Track II focused on all other issues required for a final decision resolving the merits of the dispute.  Ex. 6 ¶ 4.

On September 17, 2013, the Tribunal issued the Track I Award.  Ex. 6 ¶ 46.  In the Track I Award, the Tribunal held that both Petitioners were "Releasees," as defined in both the

9

Settlement Agreements, with access to all the contractual rights granted therein.  The Tribunal further found that, under the relevant releases, any individual not claiming personal harm (actual or threatened), was precluded from bringing any "diffuse" claim against Petitioners. Ex. 6 ¶¶ 111-112.  The Lago Agrio Judgment (as affirmed by the Ecuadorian appellate courts) decided only such "diffuse" claims.  Ex. 7 ¶ 10.8.

Ecuador subsequently challenged the Jurisdictional Award and the Track I Award, among other decisions of the Tribunal, in the District Court of The Hague (the seat of arbitration).  Among other things, Ecuador argued that "there [was] no valid arbitration agreement (3.2.1), that the awards [were] in violation of public policy (3.2.2) and that the arbitrators did not comply with their mandate (3.3.3)," and that "neither Chevron nor TexPet have an investment in Ecuador that falls within the scope of protection of the BIT."  Ex. 8 ¶¶ 3.2, 3.2.1, 3.2.2, 3.3.3.  The District Court of The Hague dismissed Ecuador's challenge in January 2016.  Ex. 7 ¶ 4.146; *see generally* Ex. 8.  Ecuador appealed the dismissal of its challenge, and, in July 2017, The Hague Court of Appeal affirmed the District Court's decision. Ex. 7 ¶ 4.146; *see generally* Ex. 9.  Ecuador further appealed to the Supreme Court of the Netherlands, which dismissed its appeal in April 2019.  Ex. 1 ¶ 2018; *see generally* Ex. 10.

On August 30, 2018, the Tribunal issued the Track II Award, which addressed all other issues required for a final decision resolving the merits of the dispute.  Ex. 7.  In the Track II Award, the Tribunal found that Ecuador breached the BIT through its participation in the Lago Agrio Litigation.  The Tribunal also found that the Lago Agrio Judgment had been procured through fraud, bribery, and corruption.  Ex. 7 ¶¶ 10.1-10.24.  Specifically, in the Track II Award, the Tribunal found, *inter alia,* that:

   i.    Material portions of the Lago Agrio Judgment were "corruptly ghostwritten" for the appointed judge by the Lago Agrio Plaintiffs' representatives in exchange for a bribe. Ex. 7 ¶ 10.4.

   ii.   Ecuador had violated its obligations towards Petitioners as "Releasees" under the 1995 Settlement Agreement. *Id.* ¶¶ 10.7-10.9.

10

iii.  The Lago Agrio Judgment "grossly violated the fundamental procedural rights" of Petitioners, was contrary to international public policy, and should not be recognized nor enforced by any State with knowledge of Ecuador's said denial of justice. *Id.* ¶ 10.10.

iv.  Ecuador is liable for any injury to Petitioners caused by the recognition or enforcement of any part of the Lago Agrio Judgment either within or outside of Ecuador. *Id.* ¶ 10.11.

v.  Ecuador is directed to cease all current and future recognition and enforcement efforts of the Lago Agrio Judgment. *Id.* ¶ 10.13.

In addition, the Tribunal found that Ecuador's conduct with respect to the Lago Agrio Judgment amounted to a "denial of justice" under the standards of customary international law. *See generally id.* Part VIII. The Tribunal found that Ecuador denied justice to Petitioners when:

i.  It failed to take appropriate steps to address Petitioners' allegations of judicial misconduct, including the "ghostwriting" of the Lago Agrio Judgment. *Id.* ¶¶ 8.34, 8.46, 8.59, 8.76-8.77, 10.5-10.6.

ii.  Ecuador and its appellate courts left the Lago Agrio Judgment "unremedied" even in the face of "sufficient information" amounting to "a strong prima facie case of judicial misconduct" and "procedural fraud" in the Lago Agrio Litigation. *Id.* ¶¶ 8.28, 8.51.

On December 10, 2018, Ecuador applied to set aside the Track II Award in the District Court of the Hague. Ex. 1 ¶ 2019. The District Court denied Ecuador's application on September 16, 2020. *Id*; *see generally* Ex. 11. Ecuador appealed to The Hague Court of Appeal, which affirmed the District Court's decision on June 28, 2022. Ex. 1 ¶ 2019; *see generally* Ex. 12. Ecuador thereafter appealed to the Supreme Court of the Netherlands, which dismissed the appeal on November 17, 2023. Ex. 1 ¶ 2019; *see generally* Ex. 13.

## IV.  The Tribunal Issues the Track III Award Against Ecuador.

After issuing the Track II Award, the Tribunal determined that it would establish a third track of the Arbitration (Track III) to consider the parties' arguments and submissions on the issue of Petitioners' damages.[4]

---

[4] The Tribunal determined that issues related to costs and expenses of the Arbitration would be dealt with in "Track IV" of the Arbitration, following Track III. Ex. 1 ¶ 58.

On November 17, 2025, the Tribunal issued the Track III Award. In the 1114-page award, the Tribunal assessed the compensation due to Chevron "in order to make full reparation" for "the injuries caused to [Petitioners] by the recognition and enforcement [by Ecuador] of the unremedied Lago Agrio Judgment." Ex. 1 ¶ 2938. The Tribunal awarded Chevron compensation for a portion of the legal fees and costs it had incurred in defending itself against the Lago Agrio Litigation and the enforcement of the Lago Agrio Judgment in numerous jurisdictions around the world.

In determining what compensation was appropriate, the Tribunal considered, among other factors, whether the legal fees and costs incurred by Chevron met the Tribunal's standards for "causation" and "reasonableness." Ex. 1 ¶¶ 328, 330, 332. The Tribunal's application of those standards was grounded in its determination that, under international law, Petitioners' claims for legal fees and damages constituted a form of "incidental damages"—as distinguished from damages proximately caused by Ecuador's unlawful acts, or "direct damages"—and that therefore a heightened causation standard should apply. *See* Ex. 1 ¶¶ 327-343.

Applying the heightened causation standard, the Tribunal awarded Chevron a total of $180,402,691.43 (exclusive of interest) to "make full reparation" for (i) defending against the Lago Agrio Litigation itself; (ii) litigating enforcement and recognition proceedings in Ecuador, Argentina, Brazil, and Canada; (iii) planning against potential enforcement actions in other jurisdictions; (iv) seeking injunctive relief against enforcement of the Lago Agrio Judgment under the RICO Act in the United States District Court for the Southern District of New York (the "RICO Litigation"); (v) seeking certain discovery under 28 U.S.C. § 1782 for use in the Lago Agrio Litigation and related proceedings; and (vi) initiating proceedings against various litigation funders in Gibraltar. Ex. 1 Part VIII(A)-(I).

12

The Tribunal awarded pre-award interest through the date of the Track III Award and post-award interest to accrue at the rate of 1-year United States Treasury bill plus 2%. Ex. 1 ¶ 2687.

On February 5, 2026, the Tribunal issued its Decision on the Respondent's Request for Correction and Interpretation of the Fourth Partial Award on Track III Under Articles 35 and 36 of the UNCITRAL Arbitration Rules (the "Correction Decision"). Ex. 2. The Correction Decision did not alter the Track III Award's substantive findings. Instead, it corrected certain "errors in computation" of the Tribunal's damages calculation. Ex. 2 ¶¶ 24-25. As a result, the total sum of awarded damages was reduced from $180,402,691.43 to $175,720,152.45, plus pre-award and post-award interest. *Id.* ¶ 44.

The Correction Decision forms part of the Track III Award. As the Tribunal stated: "For the avoidance of doubt, the Track III Award, as corrected by this Decision, is now final and binding on the Parties under Articles 32(2) and 36 of the UNCITRAL Arbitration Rules." *Id.* ¶ 46.[5]

On March 13, 2026, Ecuador served a writ of summons on the Public Prosecutor's office in The Hague, the Netherlands, for service on Petitioners of Ecuador's request that the District Court of The Hague set aside the Track III Award. Decl. ¶ 27. Petitioners intend to oppose the set-aside application by the applicable deadline, to be set by the local court. Decl. ¶ 30. Petitioners expect that the set-aside proceedings before the District Court of The Hague will not be resolved until the second half of 2027 at the earliest, and that those proceedings could easily continue into 2028. Decl. ¶ 31. Subsequent appeals could take another two to three years to be resolved. Decl. ¶ 32.

---

[5] The Tribunal's Track III Award was subject to a partial dissent by Dr. Naón, who disagreed with the majority's "automatic reduction by 85% of the RICO Litigation costs and fees" and would have awarded Petitioners "full compensation" of costs and fees. Ex. 1 ¶ 1523; *see generally* Ex. 14. Dr. Naón also dissented from the Correction Decision, as he would have rejected Ecuador's request for a correction of the award. Ex. 2 ¶ 22; *see generally* Ex. 15.

## V.    Ecuador Has Failed to Pay the Track III Award.

To date, Ecuador has not paid Petitioners any portion of the Track III Award.  Decl. ¶ 35.  Ecuador has left Petitioners with no alternative but to enforce the Track III Award through judicial means.

## ARGUMENT

Petitioners are presumptively entitled to recognition of the Track III Award, and Ecuador cannot rebut that presumption.  *First*, by appending to this Petition the BIT, Chevron's notice of arbitration, and the Track III Award (Exs. 1, 3, 4), Petitioners have made a *prima facie* showing that at least one exception to sovereign immunity applies, and Ecuador cannot carry its burden to demonstrate otherwise.[6]  *See infra* I.  *Second*, this Court "shall" recognize the Track III Award under the applicable New York Convention because Ecuador cannot demonstrate that any one of the limited exceptions to recognition applies here.  *See infra* II.B. Nor does Ecuador's recently-filed application in the Netherlands to set aside the Track III Award provide any basis to defer or stay recognition.  *See infra* Section II.B.3; II.C.  Therefore, this Court should grant the Petition and recognize and enforce the Track III Award.  In addition, because Ecuador has unjustifiably refused to pay the Track III Award for the last eight months, Petitioners are entitled to costs incurred in this proceeding.

## I.    Ecuador Is Not Immune from Suit.

The Foreign Sovereign Immunities Act ("FSIA") governs the immunity of foreign sovereigns and their instrumentalities from the jurisdiction of United States courts.  While foreign sovereigns generally are immune from suit, they "shall not be immune from the jurisdiction of courts of the United States" where certain exceptions apply.  28 U.S.C. § 1605.

---

[6] As described in the accompanying Petition, this Court has subject-matter jurisdiction under 28 U.S.C. § 1330(a) and 9 U.S.C. § 203.  The Court has personal jurisdiction over a foreign state under 28 U.S.C. § 1330(b) "whenever (1) 'an exception to immunity applies' and (2) 'service of process has been accomplished.'"  *CC/Devas (Mauritius) Ltd. v. Antrix Corp.*, 605 U.S. 223, 232-33 (2025) (citations omitted).

Two such exceptions apply here, and therefore Ecuador lacks immunity from this proceeding to recognize and enforce the Track III Award.

*First*, Ecuador lacks sovereign immunity because this is an action "to confirm an award made pursuant to" an arbitration agreement "made by the foreign state," where the "award is or may be governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards." 28 U.S.C. § 1605(a)(6); *see Devas*, 605 U.S. at 230 ("The [FSIA] also waives immunity for suits to confirm arbitration awards.") (citing Section 1605(a)(6)). This exception applies where there exists: (i) an agreement to arbitrate, (ii) an arbitration award, and (iii) a treaty governing enforcement of the award. *See Chevron Corp. v. Ecuador*, 795 F.3d 200, 204 (D.C. Cir. 2015)*; accord LLC SPC Stileks v. Republic of Moldova*, 985 F.3d 871, 877 (D.C. Cir. 2021). Once the petitioner has satisfied an initial burden of production, "the burden of persuasion rests with the foreign sovereign claiming immunity, which must establish the absence of the factual basis by a preponderance of the evidence." *Chevron*, 795 F.3d at 204.

Petitioners have more than satisfied their initial burden here. As the D.C. Circuit noted in a 2015 litigation between Petitioners and Ecuador, by "producing the BIT, Chevron's notice of arbitration against Ecuador, and the tribunal's arbitration decision," Chevron made a *prima facie* showing that the arbitration exception applied. *Chevron*, 795 F.3d at 204-05.[7] Petitioners have made the same showing here, which Ecuador cannot rebut. Ecuador has never "dispute[d] the existence of the BIT." *Id.* Indeed, the D.C. Circuit previously concluded that the BIT "includes a standing offer to all potential U.S. investors to arbitrate investment disputes, which Chevron accepted in the manner required by the treaty," and the "FSIA therefore allows federal

---

[7] In *Chevron Corp. v. Ecuador*, this Court recognized, and the D.C. Circuit affirmed, a separate arbitral award in favor of Chevron against Ecuador arising out of the same BIT and 1995 Settlement Agreement. *See Chevron Corp. v. Republic of Ecuador*, 949 F. Supp. 2d 57 (D.D.C. 2013); *Chevron*, 795 F.3d at 200.

15

courts to exercise jurisdiction over Ecuador in order to consider an action to confirm or enforce the award." *See Chevron*, 795 F.3d at 206 (relying on *BG Grp., PLC v. Republic of Argentina*, 572 U.S. 25 (2014)); *see also Zhongshan Fucheng Indus. Inv. Co. v. Fed. Republic of Nigeria*, 112 F.4th 1054, 1075 (D.C. Cir. 2024) (the district court had jurisdiction under the FSIA's arbitration exception to recognize an award under the New York Convention that arose from a bilateral investment treaty). The D.C. Circuit's decision is binding authority and, in any event, Ecuador cannot relitigate that issue here. *See Robinson v. U.S. Dep't of Educ.*, 502 F. Supp. 3d 127, 133 (D.D.C. 2020) ("the doctrine of issue preclusion specifically bars successive litigation of an issue of fact or law actually litigated and resolved in a prior judgment") (citation modified). Accordingly, Ecuador lacks sovereign immunity under the arbitration exception. 28 U.S.C. § 1605(a)(6).

*Second*, Ecuador lacks sovereign immunity for the additional and independent reason that it has "waived its immunity either explicitly or by implication" by entering into the BIT and New York Convention. 28 U.S.C. § 1605(a)(1). This Court has repeatedly recognized that, by signing the New York Convention and agreeing to arbitrate in another Contracting State, a sovereign waives its immunity from recognition actions in the United States. *See, e.g.*, *M.B.L. Int'l Contractors, Inc. v. Republic of Trinidad and Tobago*, 725 F. Supp. 52, 55–56 (D.D.C. 1989) (respondent state, being a signatory to the New York Convention, "must have contemplated the participation of the United States courts for enforcement of arbitration awards under the Convention notwithstanding that the Respondent is a foreign state"); *PAO Tatneft v. Ukraine,* 771 F. App'x 9, 10 (D.C. Cir. 2019) (implied waiver where a Contracting State to the New York Convention agreed to arbitrate in the territory of another Contracting State); *Creighton Ltd. v. Gov't of Qatar*, 181 F.3d 118, 123 (D.C. Cir. 1999) (defendant sovereign must be a New York Convention Contracting State for implied waiver exception to apply); *Ipitrade Int'l, S.A. v. Federal Republic of Nigeria*, 465 F. Supp. 824, 826 (D.D.C. 1978)

16

(implied waiver where Nigeria was a Contracting State to the New York Convention and had agreed to arbitrate in France, another Contracting State).

Ecuador and the United States are both Contracting States to the New York Convention.[8]  By entering into the BIT, Ecuador agreed to arbitrate its disputes with United States investors in other Contracting States to the New York Convention.  Ex. 3 art. VI(5); Ex. 4 ¶ 2.7(5) ("Any arbitration under paragraph 3(a)(ii), (iii) or (iv) of this Article shall be held in a state that is a party to the New York Convention.").  The Arbitration was seated in the Netherlands, another Contracting State.[9]  Accordingly, by signing the New York Convention and then agreeing to arbitrate in the Netherlands, Ecuador waived its immunity from recognition actions in the United States.

For these independent reasons, the Court has jurisdiction over Ecuador in this action.

## II.   The New York Convention and United States Law Require Recognition of the Track III Award.

This Court should recognize and enforce the Track III Award under the New York Convention, which is incorporated into federal law by Chapter 2 of Title 9 of the United States Code.  *See* 9 U.S.C. §§ 201-08.  "Consistent with the *emphatic* federal policy in favor of arbitral dispute resolution recognized by the Supreme Court," the New York Convention's implementing statute "affords the district court little discretion in refusing or deferring enforcement of foreign arbitral awards."  *Belize Soc. Dev. Ltd. v. Gov't of Belize*, 668 F.3d 724, 727 (D.C. Cir. 2012) (citations and quotations omitted) (emphasis added); *accord Chevron Corp.*, 795 F.3d at 207.  Accordingly, this Court "shall" recognize the Track III Award unless

---

[8]   New York Convention, Contracting States, available at https://www.newyorkconvention.org/contracting-states/contracting-states (last visited July 16, 2026) (listing Ecuador as a Contracting State as of December 17, 1958, ratified on January 3, 1962, and the United States as ratifying the New York Convention on September 30, 1970).
[9]   New York Convention, Contracting States, available at https://www.newyorkconvention.org/contracting-states/contracting-states (last visited July 16, 2026) (listing the Netherlands as a Contracting State as of June 10, 1958, ratified on April 24, 1964).

Ecuador can carry its heavy burden of establishing that one of the narrow grounds for refusing recognition applies here. *See* 9 U.S.C. § 207 ("The court *shall* confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention.") (emphasis added); *PAO Tatneft v. Ukraine*, 301 F. Supp. 3d 175, 198 (D.D.C. 2018) (citing *Int'l Trading & Indus. Inv. Co. v. DynCorp Aerospace Tech.*, 763 F. Supp. 2d 12, 20 (D.D.C. 2011)) (because "the New York Convention provides only several narrow circumstances when a court may deny confirmation of an arbitral award, confirmation proceedings are generally summary in nature"), *aff'd*, 21 F.4th 829 (D.C. Cir. 2021); *Sterling Merch. Fin. Ltd. v. Republic of Cabo Verde*, 261 F. Supp. 3d 48, 53 (D.D.C. 2017) ("The party resisting confirmation 'bears the heavy burden of establishing that one of the grounds for denying confirmation in Article V applies.'") (citation omitted).

As explained below, the New York Convention governs recognition of the Track III Award and Ecuador cannot carry its "heavy burden" to demonstrate that one of the limited grounds for non-recognition applies. Nor can Ecuador establish that its recently filed set-aside application provides a basis to defer recognition. The Court should therefore recognize the Track III Award.

> **A.    Recognition of the Track III Award is Governed by the New York Convention.**

The New York Convention governs recognition here because the Track III Award (i) was made in the Netherlands, a Contracting State to the New York Convention; and (ii) arose out of the BIT, which created a legal, commercial relationship between Petitioners and Ecuador.

The New York Convention applies to "the recognition and enforcement of arbitral awards made in the territory of a State other than the State where the recognition and enforcement of such awards are sought." New York Convention art. I(1). Moreover, in the United States, the New York Convention applies (i) "to the recognition and enforcement of

18

only those awards made in the territory of another Contracting State" (*see* New York Convention, 21 U.S.T. at 2560; *Zhongshan*, 112 F.4th at 1059); and (ii) to differences "arising out of a legal relationship, whether contractual or not, which is considered as commercial" (*see Zhongshan*, 112 F.4th at 1059; 9 U.S.C. § 202 ("[a]n arbitration agreement or arbitral award arising out of a legal relationship . . . which is considered as commercial . . . falls under the [New York] Convention")).  Both requirements are satisfied here.

*First*, as discussed above, both the Netherlands (the state where the Track III Award was issued) and the United States (where recognition is sought) are Contracting States to the New York Convention.  *See supra* pp. 16-17.

*Second*, the Track III Award arises out of the BIT, which creates a legal relationship between Petitioners and Ecuador that is commercial in nature.  "Two parties share a legal relationship within the meaning of the New York Convention if there is an agreement, whether contractual or not, that (1) explicitly contemplates which parties it will obligate; (2) determines the extent of the obligations; and (3) provides the legal framework to govern the arrangement." *Zhongshan*, 112 F.4th at 1062 (citation modified).  Here, the United States and Ecuador negotiated the BIT, a treaty that was intended to confer reciprocal benefits on investors to foster and protect investment between the countries.  *See id.*  The BIT guarantees that United States investors like Petitioners receive treatment "no less favorable" than that afforded to Ecuadorian investors and companies.  *See* Ex. 3 art. II(1).  As the D.C. Circuit already concluded, Petitioners, as investors, are intended beneficiaries of the BIT.  *See Chevron*, 795 F.3d at 207 (the Supreme Court has "analyzed a similar bilateral investment treaty [to the BIT] as if it were a contract between the sovereign and the investor corporation seeking to confirm an arbitral award") (relying on *BG Grp.*, 572 U.S. 25).  Ecuador therefore owes Petitioners a duty to perform Ecuador's promises under the BIT, and Petitioners have the right to enforce those

19

promises through arbitration. *See Zhongshan*, 112 F.4th at 1063. Thus, the BIT creates a "legal" relationship for purposes of recognition under the New York Convention.

In addition, the relationship between Petitioners and Ecuador created by the BIT is "commercial" in nature. The relationship between the parties exists because Petitioners made a "commercial investment" in a "money-making enterprise" explicitly "under a bilateral treaty aimed at promoting commercial investment and protecting commercial investors." *Zhongshan*, 112 F.4th at 1063. Indeed, the BIT states that it is "premised on the view that an open investment policy leads to economic growth," and that the goals of the BIT are "economic cooperation, increased flow of capital, a stable framework for investment, development of respect for internationally-recognized worker rights, and maximum efficiency in the use of economic resources." Ex. 3 at 1; *see Zhongshan*, 112 F.4th at 1063-65 (concluding that a bilateral investment treaty between China and Nigeria is "commercial in nature" and that "an arbitral award arising from that relationship satisfies the commercial reservation").[10]

Accordingly, the New York Convention applies, and this Court "shall" enforce the Track III Award.

### B.    No Basis Exists to Refuse Recognition of the Track III Award.

Ecuador cannot carry its "heavy burden" to establish that a basis for refusing recognition exists here. *Sterling*, 261 F. Supp. 3d at 53; *see also Ottley v. Schwartzberg*, 819 F.2d 373, 376 (2d Cir. 1987) ("showing required to avoid summary confirmation is high").

A court may refuse recognition of an award only in the limited circumstances enumerated in Article V of the New York Convention:

---

[10] In *Zhongshan*, the panel's majority also concluded that the parties satisfied the requirement of the New York Convention that the arbitration award arise from a dispute between "persons," whether physical or legal. 112 F.4th at 1065 (citing New York Convention art. I(1)). The majority rejected Nigeria's argument that foreign states are "persons" under the New York Convention only when they act in their private capacity, and that Nigeria acted solely as a sovereign with respect to the claimant when it allegedly breached its obligations under the bilateral investment treaty. *Id.* at 1065-75.

- the parties' arbitration agreement is invalid;

- the award debtor had no notice of the arbitration proceedings or was unable to meaningfully participate;

- the award resolves a type of dispute that the parties did not agree to arbitrate;

- the arbitration used procedures (including for the composition of the tribunal) that are inconsistent with the parties' arbitration agreement;

- the award is not yet binding on the parties or has been set aside by a competent authority of the country in which, or under the law of which, the award was made;

- the award resolves a type of dispute that, under the laws of the country where recognition is sought, cannot be resolved through arbitration; or

- recognizing the award would contravene the public policy of the country where recognition is sought.

*See* New York Convention art. V; *Belize Soc. Dev.*, 668 F.3d at 727.

Courts in this and other Circuits have consistently cautioned that the grounds for refusing recognition are to be construed narrowly. *See, e.g.*, *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 244 F. Supp. 3d 100, 110 (D.D.C. 2017) (characterizing the "scope of its review" under the New York Convention as "narrow"); *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 364 F.3d 274, 288 (5th Cir. 2004) ("[d]efenses to enforcement under the New York Convention are construed narrowly, 'to encourage the recognition and enforcement of commercial arbitration agreements in international contracts'"); *Ministry of Def. of the Islamic Republic of Iran v. Gould Inc.*, 887 F.2d 1357, 1364 n.11 (9th Cir. 1989) ("Courts construe . . . defenses to enforcement narrowly.").

As discussed below, no basis exists to refuse recognition of the Track III Award. The dispute giving rise to the Track III Award was subject to a valid arbitration agreement; Ecuador had notice of, and fully participated in, the Arbitration; the Track III Award is binding and has not been set aside; and recognizing and enforcing the Track III Award comports with United States public policy.

21

**1.    The BIT's Arbitration Agreement is Valid, and the Track III Award Resolves a Dispute the Parties Agreed to Arbitrate.**

*First*, Ecuador cannot establish that the BIT's arbitration agreement is invalid. A court can deny recognition where the arbitration agreement "is not valid under the law to which the parties have subjected it or, failing any indication thereon, under the law of the country where the award was made." New York Convention art. V(1)(a); 9 U.S.C. §§ 201, 207 (incorporating the New York Convention's "grounds for refusal").

The BIT itself provides that its arbitration agreement is valid for purposes of the New York Convention. Ex. 3 art. VI (4)(b). Indeed, another Court in this District has already concluded that Chevron and Ecuador "had a valid agreement to arbitrate under the BIT." *Chevron Corp.*, 949 F. Supp. 2d at 67. Further, since the courts of the Netherlands already decided that the arbitration agreement was valid in connection with Ecuador's challenge to the Jurisdictional Award, Ecuador cannot relitigate that point here under the principle of issue preclusion. *See Hulley Enters. v. Russian Fed'n*, 149 F.4th 682, 691 (D.C. Cir. 2025) ("the decisions of the Dutch courts [on the existence of an arbitration agreement] may control the factual questions that the district court must answer").[11]

*Second*, Ecuador cannot demonstrate that the Track III Award exceeded the scope of the BIT's arbitration agreement. A court can deny recognition where "[t]he award deals with a difference not contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration." New York Convention art. V(1)(c). Here, "the BIT allows the arbitration tribunal to make that

---

[11] Issue preclusion likewise prevents Ecuador from raising new arguments here that it could have made, but did not make, in the Arbitration, the Dutch set-aside proceedings, or in the earlier litigation against Petitioners before this Court, such as an argument that it somehow lacked capacity to enter into the BIT. *See Arrington v. Fed. Pub. Def. for D.C.*, 75 F. Supp. 3d 340, 345 (D.D.C. 2014) ("The doctrine of *res judicata* precludes the parties from relitigating issues that were *or could have been* raised in [a prior] action.") (citation modified and emphasis added); *OJSC Ukrnafta v. Carpatsky Petrol. Corp.*, 957 F.3d 487, 498 (5th Cir. 2020) (respondent waived Article V(1)(a) argument by failing to raise it in arbitral proceedings).

[arbitrability] determination." *Chevron*, 795 F.3d at 207.  And the Tribunal (and the courts of the Netherlands) expressly decided that the parties' dispute was an "investment dispute" subject to arbitration under the BIT.[12]  Ex. 5 ¶¶ 4.35, 5.1-5.5; Ex. 7 ¶¶ 7.49, 7.67, 7.70-7.71, 7.78, 7.115.  Accordingly, because the arbitrability determination was left to (and decided by) the Tribunal, this Court may not revisit that issue.  *See Chevron*, 795 F.3d at 207; *Hulley*, 149 F.4th at 689 ("when parties delegate questions of arbitrability to an arbitral tribunal, this court is bound by the tribunal's determinations"); *Schneider v. Kingdom of Thailand*, 688 F.3d 68, 74 (2d Cir. 2012) (where the treaty refers questions of arbitrability to the arbitrators, a party opposing recognition "is not entitled to an independent judicial redetermination of that same question"); *Rusoro Mining Ltd. v. Bolivarian Republic of Venezuela*, 300 F. Supp. 3d 137, 147 (D.D.C. 2018) ("When the parties have committed the jurisdictional determination to the arbitrator, courts should give considerable leeway to the arbitrator, setting aside his or her decision as to the scope of his or her authority over the case at hand only in certain narrow circumstances.") (citation modified).

The Court should reject any objection that the arbitration agreement was invalid or did not encompass the dispute resolved by the Track III Award.

---

[12] The BIT provides for arbitration of "investment disputes."  Ex. 3 art. VI(4) ("[e]ach party hereby consents to the submission of any investment dispute for settlement by binding arbitration").  Article VI(1) of the BIT defines an investment dispute as:

> a dispute between a Party and a national or company of the other Party arising out of or relating to (a) an investment agreement between that Party and such national or company; (b) an investment authorization granted by that Party's foreign investment authority to such national or company; or (c) an alleged broach [sic] of any right conferred or created by this Treaty with respect to an investment.

Ex. 3 art. VI(1).  Ecuador tried, but failed, to have the Tribunal's arbitrability determination set aside by the courts of the Netherlands.  Ex. 7 ¶ 4.146; Ex. 1 ¶ 2018.

### 2.    Ecuador Had Notice of and Fully Participated in the Arbitration.

Ecuador cannot argue it lacked notice of, and did not fully participate in, the Arbitration. Ecuador had proper and valid notice of the Arbitration and fully participated at every relevant stage. Petitioners served Ecuador with a Notice of Arbitration on September 23, 2009, to which Ecuador responded. Ex. 7 ¶¶ 7.85, 7.156; Ex. 4. From that point forward, Ecuador participated fully at *each stage* of the proceedings. Ecuador was at all times represented by able counsel, including the Ecuadorian Office of the Attorney General and reputable international law firms (including Winston & Strawn LLP and Dechert LLP), which mounted multiple defenses on its behalf, including as to liability and as to damages. Throughout the 17-year-long Arbitration, Ecuador submitted multiple written submissions, expert reports, and witness statements. It was present at and participated in each of the hearings held by the Tribunal. Ex. 1 ¶¶ 59-65; Ex. 6 ¶¶ 6-12; Ex. 7 ¶¶ 1.47-1.56. Accordingly, to the extent that Ecuador were to argue that it "was not given proper notice of the appointment of the arbitrator or of the arbitration proceedings or was otherwise unable to present [its] case" (New York Convention art. V(1)(b); *see also* 9 U.S.C. §§ 201, 207), this Court should summarily reject that argument.

Furthermore, the Arbitration followed proper procedures and was properly constituted. The Arbitration proceeded before the PCA in accordance with UNCITRAL Rules and the Tribunal's Procedural Order No. 1, which reflected the agreement of both parties. Ex. 7 ¶ 1.14. The Tribunal was constituted and agreed to by both parties: one arbitrator was nominated for appointment by Petitioners, one arbitrator was nominated for appointment by Ecuador, and the third arbitrator was appointed by the PCA. *Id.* ¶ 1.16. Ecuador never objected to the procedures governing the Arbitration, nor did it ever assert in the Arbitration that the composition of the Tribunal was not in accordance with the parties' agreement. Accordingly, the Court should reject any objection to recognition based on "[t]he composition of the arbitral authority" or "the arbitral procedure." New York Convention art. V(1)(d); *see also* 9 U.S.C. §§ 201, 207.

24

### 3.    The Track III Award Is Binding and Has Not Been Set Aside at the Seat of Arbitration.

The Track III Award was issued as a final, binding award on the parties, and Ecuador cannot demonstrate otherwise.  The UNCITRAL Rules, BIT, and Track III Award itself all provide that the Track III Award is final and binding.  Under Article 32 of the UNCITRAL Rules, arbitration rulings issued pursuant to its procedures "shall be final and binding upon the Parties."  UNCITRAL Rules art. 32, ¶ 2.  Similarly, Article VI (6) of the BIT provides that "[a]ny arbitral award rendered pursuant to this Article shall be final and binding on the parties to the dispute."  Ex. 3 art. VI(6).  And, as the Tribunal stated, "the Track III Award, as corrected by [the Correction Decision], is now final and binding on the Parties."  Ex. 2 ¶ 46.

In addition, the Track III Award has not been set aside in the Netherlands, the seat of the Arbitration.  On March 13, 2026, Ecuador served a writ of summons on the Public Prosecutor's office in The Hague for service on Petitioners of its request that the District Court of The Hague set aside the Track III Award.  Decl. ¶ 27.  But Petitioners plan to oppose this set-aside application, and it provides no basis for refusing recognition here.

### 4.    Recognizing the Track III Award Comports with United States Public Policy.

Recognizing and enforcing the Track III Award is consistent with United States public policy.  United States courts have long favored arbitration of international commercial disputes.  The Supreme Court has recognized not only an "'emphatic federal policy in favor of arbitral dispute resolution,'" but also that this federal policy "'applies with special force in the field of international commerce.'"  *Belize Soc. Dev.*, 668 F.3d at 733 (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631 (1985)).  As a court in this District has previously observed, "[a]lthough [the public policy] defense [to recognition] is frequently raised, it 'has rarely been successful.'"  *Chevron Corp.*, 949 F. Supp. 2d at 69 (quoting *Ministry*

25

*of Def. & Support for the Armed Forces of the Islamic Republic of Iran v. Cubic Def. Sys., Inc.*, 665 F.3d 1091, 1097 (9th Cir. 2011)).

In a recognition action under the New York Convention, "the public policy defense is . . . to be applied only where enforcement would violate the United States' most basic notions of morality and justice." *Belize Bank Ltd. v. Gov't of Belize*, 852 F.3d 1107, 1111 (D.C. Cir. 2017) (citation modified). This plainly would not be the case here. If anything, United States public policy would specifically favor recognizing the Track III Award. As detailed above, the Track III Award is the result of years of protracted arbitration between Petitioners and Ecuador following Ecuador's involvement in fraudulently and corruptly procuring and enforcing the Lago Agrio Judgment. *See supra* pp. 5-11. International arbitration was designed to provide recourse to parties like Petitioners, and the United States has made it its policy to support and recognize such proceedings.

Accordingly, there is no valid argument that "[t]he subject matter of the difference [*i.e.*, the dispute submitted to arbitration] is not capable of settlement by arbitration under the law of that country" or "[t]he recognition or enforcement of the award would be contrary to the public policy of [the United States]." New York Convention art. V(2)(a-b); *see also* 9 U.S.C. §§ 201, 207.

### C. No Basis Exists to Defer Recognition of the Track III Award.

Notwithstanding that Ecuador recently initiated a set-aside proceeding in the Netherlands, this Court should recognize the Track III Award now and decline any request by Ecuador to defer this recognition proceeding. United States courts are empowered to proceed with recognition and enforcement of an arbitration award even where a set-aside application is pending. *See* New York Convention art. VI (the enforcing court "*may, if it considers it proper*, adjourn the decision on the enforcement of the award*") (emphasis added); 9 U.S.C. §§ 201,

26

207; *Stileks*, 985 F.3d at 880 ("it is difficult to conceive of a greater delegation of discretion than 'if [the court] considers it proper'") (citation omitted).[13]

A "stay of confirmation should not be lightly granted." *Gold Rsrv. Inc. v. Bolivarian Republic of Venezuela*, 146 F. Supp. 3d 112, 134 (D.D.C. 2015) (citing *Europcar Italia, S.p.A. v. Maiellano Tours, Inc.*, 156 F.3d 310, 317 (2d Cir. 1998)). Accordingly, courts in this Circuit routinely decide (and grant) recognition petitions in these circumstances. *See, e.g., Stileks*, 985 F.3d at 880-81; *Gold Rsrv.*, 146 F. Supp. 3d 112, 134-37; *Hardy Expl. & Prod. (India), Inc. v. Gov't of India, Ministry of Petrol. & Nat. Gas*, 314 F. Supp. 3d 95, 108 (D.D.C. 2018); *Chevron Corp.*, 949 F. Supp. 2d at 73. Recognition, irrespective of the pending set-aside application, is consistent with United States policy favoring international arbitration, the expeditious resolution of disputes, and the avoidance of protracted and expensive litigation. *See Stileks*, 985 F.3d at 880-81 (considering "the general objectives of arbitration—the expeditious resolution of disputes and the avoidance of protracted and expensive litigation" and "the status of the foreign proceedings and the estimated time for those proceedings to be resolved" in declining stay).

Proceeding with recognition is particularly appropriate here because this dispute has already stretched on for 17 years, since Petitioners served their Notice of Arbitration in 2009. *See Stileks*, 985 F.3d at 880-81 (denying stay pending set-aside where it had been over ten years since the underlying notice of arbitration, and stating "this is hardly an expeditious resolution of the dispute") (quotation and citations omitted); *Chevron Corp.*, 949 F. Supp. 2d at 72-73 (denying stay where Chevron "submitted its Notice of Arbitration . . . more than six years ago"). This is Ecuador's *third* set of set-aside proceedings in the Arbitration, and the Dutch courts have already roundly rejected the first two, including with respect to Ecuador's

---

[13] Under the law of the Netherlands, a set-aside application does not automatically suspend the enforcement of the arbitral award.

liability.  *See supra* p. 9; Ex. 7 ¶ 4.146; *see also generally* Ex. 8-13.  Accordingly, Ecuador's most recent set-aside application is limited to the quantum of damages and should be seen as nothing more than a tactical attempt to delay enforcement of the Track III Award (though a set-aside application itself does not automatically suspend enforcement of an arbitral award).  *See generally* Exs. 11-13, 16.  Given the many years it has taken for the Tribunal to finally determine the amount that Ecuador should compensate Petitioners, the Court should not adjourn a decision on this Petition in the face of Ecuador's refusal to pay the Track III Award.[14] Further, a decision on the set-aside application is likely a year or two away, with appeals lasting another two or three years.  Decl. ¶¶ 31-32.  It would be prejudicial to Petitioners if the Court were to delay this recognition proceeding for that long, especially since it likely will take a significant amount time for this proceeding to be resolved—all the while Petitioners would not be able to start collecting in this country on the large debt that Ecuador owes them under the Track III Award.  *See In re Arb. of Certain Controversies between Getma Int'l and Republic of Guinea*, 142 F. Supp. 3d 110, 119 (D.D.C. 2015) ("staying these proceedings indefinitely could be seen as an abuse of discretion").

Finally, while a stay pending Ecuador's set-aside application would be neither necessary nor proper, in the event that this Court were inclined to adjourn a decision on enforcement pending the set-aside application, Petitioners respectfully request that the Court order Ecuador to post security in the full amount of the Track III Award.  *See* New York

---

[14] While the Court need not get into the substance of Ecuador's newest set-aside application to grant this Petition, even a surface level review makes clear that it is meritless.  For example, Ecuador, remarkably, argues that the Track III Award somehow violates public policy because Ecuador alleges that Petitioners knowingly allowed a corrupt judgment (the Lago Agrio Judgment) to be rendered in Ecuador so that Petitioners could use the BIT as a vehicle for recovery.  *See, e.g.,* Ex. 16 ¶ 41 ("Chevron et al. then based their claims under the Treaty largely on that corruption . . . . They thus used the Treaty as an insurance policy.").  The idea that Petitioners would allow a corruptly "ghostwritten" judgment to be issued against them and have to face years of multi-national litigation to fight that judgment is preposterous.  It is also completely contrary to the facts found by the Tribunal itself.

Convention art. VI (when enforcement proceedings are stayed, enforcement courts "may also, on the application of the party claiming enforcement of the award, order the other party to give suitable security"); *PAO Tatneft v. Ukraine*, 2021 WL 2209460, at *5 (D.D.C. June 1, 2021) (stay without bond unwarranted where respondent has been avoiding payment and failed to "demonstrate its willingness to pay the Judgment").

### III.    Petitioners are Entitled to Reasonable Costs and Attorneys' Fees Incurred in Recognizing the Track III Award.

This Court should grant Petitioners reasonable costs and attorneys' fees incurred in the enforcement of the Track III Award.  A party seeking recognition of an arbitral award "may recover reasonable attorneys' fees and costs, at least where the respondent unjustifiably refused to abide by the arbitral award." *Swiss Inst. of Bioinformatics v. Glob. Initiative on Sharing All Influenza Data*, 49 F. Supp. 3d 92, 98 (D.D.C. 2014) (quoting *Concesionaria Dominicana de Autopistas y Carreteras, S.A. v. Dominican State*, 926 F. Supp. 2d 1, 3 (D.D.C. 2013)).  The Track III Award was issued nearly eight months ago, in November 2025.  Ecuador has not paid Petitioners any portion of the Track III Award.  Decl. ¶ 35.  Petitioners have spent 17 years in arbitration to get to this point, and Ecuador has resisted every step of the way, including through numerous failed applications to set aside the Tribunal's earlier awards.  There is simply no justification for Ecuador to refuse to pay the Track III Award, and Petitioners should be entitled to their attorneys' fees and costs in seeking enforcement of their award as a means to force Ecuador to pay what it owes.

### CONCLUSION

For the foregoing reasons, the Court should recognize the compensatory obligations of the Track III Award and enter a judgment against Ecuador in the amount of the Track III Award including post-award interest that has accrued through the date of the judgment, as well as reasonable attorneys' fees and costs associated with recognition and enforcement of the Track III Award.

29

Dated: July 17, 2026
      Washington, D.C.

Respectfully submitted,

By: */s/ Josef M. Klazen*

Josef M. Klazen
D.C. Bar No. 1003749
josef.klazen@kobrekim.com
Steven G. Kobre
D.C. Bar No. 448923
steven.kobre@kobrekim.com
Jeremy O. Bressman (*pro hac vice pending*)
jeremy.bressman@kobrekim.com
Lydia L. Halpern (*pro hac vice pending*)
lydia.halpern@kobrekim.com
Alyssa L. Aubuchon (*pro hac vice pending*)
alyssa.aubuchon@kobrekim.com
KOBRE & KIM LLP
1919 M Street NW
Washington, D.C. 20036
Telephone: (202) 664-1900

*Attorneys for Petitioners Chevron*
*Corporation and Texaco Petroleum Company*

30